SMITH, et al. vs. GILMOR, et al. Garn. of WILLINK, et al.

*1816.*

*Smith vs Gilmor*

*JUNE.*

APPEAL from *Baltimore* County Court. In this case an attachment issued on the 2d of February 1805, in the names of the appellants, against the lands, tenements, goods, chattels and credits, of *Wilhem* and *Jan Willink*, in virtue of a warrant from a justice of the peace of *Baltimore* county, directed to the clerk of the county court of that county, accompanied by an affidavit and account, pursuant to the directions of the act of assembly of 1795, ch. 56. At the same time the plaintiffs sued out a writ of *capias ad respondendum* against the defendants, and filed a short note, stating that the suit was brought to recover the sum of $14,094 84 due to them from the defendants on account; and a copy of the short note was sent with the said writ, endorsed thereon "to be set up at the court house door by the sheriff." The attachment at the return day was returned by the sheriff, laid in the hands of *Robert Gilmor* and others, (the appellees,) and the writ of *capias ad respondendum* was returned *Tarde.* The garnishees being called appeared, and pleaded *non assumpsit* by *W.* and *J. Willink*, and for themselves *nulla bona*; to the last plea there was the general replication, and issues were joined.

1. At the trial in October 1808, the plaintiffs gave in evidence, that in the year 1801, they dispatched to *Amsterdam* in *Holland*, a ship called *The Union*, belonging to them and destined for a voyage from thence to *Batavia* in the *East Indies*; that *R. Purviance*, junior, was appointed by them supercargo of the said ship, and their agent for the whole voyage, with instructions to apply for assistance and advice in transacting the business to Messrs. *Wilhem* and *Jan Willink* of *Amsterdam*, (the original defendants in this

*W, by letter, in answer to an inquiry made of him by P, on what terms bills on Batavia to the amount of $30,000, could be had at Amsterdam, &c. stated, that "bills on Batavia might be purchased to the amount of £75,000, or $30,000, at 48 per rix dollar of 2 1-2 a piece, and 10 or 12 pr. ct. discount, to be paid immediately" —Held, by Baltimore county court, that the construction of the answer to the letter was, that an investment of 75,000 florins, Holland currency, or $30,000, money of the U. S. might be made in bills on Batavia, drawn according to the usual course of trade, in rix dollars; that for each rix dollar, for which the bills should be drawn, the purchaser would have to pay 48 stivers, Holland currency; and the value of the rix dollar, thus drawn for, was 2 1 2 florins Holland currency. That court also held, that if W was authorised by P, and undertook to purchase bills according to the*

terms stated in the above answer, and none other, he was obliged to purchase according to those terms or not to have purchased at all.

That court being divided in opinion, (only two judges present,) refused the defendants' prayer to direct the jury that W was not bound by his undertaking to procure bills which would produce in *Batavia* 30,000 *Spanish* dollars. On appeal—*Held*, tha the prayer ought to have been rejected.

That court being divided in opinion, also refused the defendants' prayer to direct the jury, that if P, when he received the bills from W, knew them to be bills on *Batavia* for 30,000 rix dollars, and knew the sum of money for which they had been purchased; and that W, in making that purchase, undertaking of the order, and giving the information on which it was founded, acted fairly and with good faith, and procured the bills on as advantageous terms as they could then have been obtained, then the acceptance of the bills by P was an assent to the purchase. On appeal—*Held*, that the direction asked for ought to have been given.

That court being divided in opinion, also refused the defendant's prayer to direct the jury, that if W, by his letter to P, understood it to mean, that bills on *Batavia* to the amount of 75,000 florins, *Holland* currency, or $30,000, currency of the U. S. at 2 1-2 florins to the dollar, might be purchased at the rate of 48 stivers, *Holland* currency, for each rix dollar of *Holland*, in heavy stivers, with a discount of 10 or 12 pr. ct. and intended his letter to be so understood at the time of writing it, then he is not responsible for having purchased the bills at that price. On appeal—*Held*, that the prayer ought to have been rejected.

The defendant having prayed the court to direct the jury on particular points, and the court being divided in opinion, only two judges being present, refused the prayer, to which refusal the plaintiff and defendant both excepted, according to the act of 1778, ch 21. On appeal by the plaintiff—*Held*, that he had a right to the benefit of his exception.

A declaration need not be filed in a case against garnishees who appear to, and contest an attachment on warrant, if a short note is filed at the time of issuing the *capias* sued out with the attachment.

cause,) who were the regular correspondents of the plaintiffs in that place. That the ship and supercargo arrived in *Amsterdam* some time previous to the 29th of July 1801, on which day *Purviance*, wishing to obtain information as to the practicability of placing the value of $30,000, money of the *United States*, in *Batavia*, by means of bills of exchange, and the terms on which those bills could then be obtained in *Amsterdam*, addressed to the Messrs *Willink* on the 29th of July 1801 the following letter: "I want to purchase, if possible, good bills on *Batavia* to the amount of $30,000. What are the lowest terms at which they may be had? I propose paying for them in the following manner:—With the freight of *The Union*, after deducting her disbursements and other charges—With the proceeds of my brother's sugars—With a remittance (which I look for momently) either in a bill, or in sugars, or, should it not arrive in time, with remittances from *Bremen*. Would it be possible to purchase the bills of the *India Company*? If so, would they be payable in produce at the market price, on fixing the prices now? Will the bills be payable in specie, or paper? If the latter, what will be the proportionate value? It will be materially necessary that the bills be drawn at sight." That to this letter the *Willinks* on the same day returned this answer, written in the *English* language, viz. "Bills on *Batavia* might be purchased to the amount of f.75,000 or $30,000 at 48 per rix dollar of 2½ a piece, and 10 or 12 *per cent.* discount, to be paid immediately, with an in case of need, on three, four or five persons, and at last on the governor of *Batavia*, to be paid there at sight, or at a few days, say 4 or 8, sight, to the order of Mr. *R. Purviance* junr. and in case of his death, of Capt. *Porter*, or any one that Mr. *P.* should wish." That after receiving this answer *Purviance* gave orders to the *Willinks* to purchase bills for him accordingly, for the use of the plaintiffs, and of the said voyage, which purchase the *Willinks* undertook to make as agents for the plaintiffs at the usual commission. That in pursuance of this order and undertaking the *Willinks* did purchase for the use of the plaintiffs at the rate and price of 48 stivers to the rix dollar, with a rebatement or discount of 12 *per cent.* good bills on *Batavia* to the amount of 30,000 rix dollars, payable at 4 days sight, which bills were written in the *Dutch* language, and an admitted true translation of one of them. (the others, one for 15,000 and the other for 10,000 rix dollars, being of the same tenor) is as follows, viz. "At *Amsterdam* the 18th of August 1801. For rix ds. 5000. At four days sight please to pay for this first bill of exchange, to the order of Mr. *Rob. Purviance*, junior, and in case of decease, to Cap. *A. Porter* of the ship *Union*, the sum of five thousand rix dollars weighty sts. of forty-eight stivers. Value received from Messrs. *Wilhem* and *Jan. Willink*, and place to account as per advice from

Your Ob. Serv.

(Signed)      *J. Temminck* & *A. H. C. Staringh.*

1816.

Smith
vs
Gilmor

To the hon'ble. Messrs. *Neun*, *Wieze* & *Wiegman*, executors of the estate of the late Mr. *Wiegermen*, *Batavia.* In case of need to apply to his excellency Mr. *Van Overstraten*." That the said bills were delivered to *Purviance* at *Amsterdam* on the 18th of August 1801, who at the time when they were presented to him stated to the *Willinks* that he did not understand the *Dutch* language, and therefore wished to have the bills explained to him in the *English* language. Whereupon they delivered to him, instead of a verbal explanation of the bills, the following paper purporting to be a translation of the substance of one of the bills, viz. *Amst.* 18th August 1801.

"At 4 days sight please to pay for this first of exchange, to the order of Mr. *Robert Purviance*, junr. and in case of death, to Capt. *A. Porter* of *The Union*, the sum of —— heavy money, value of Messrs. *W.* & *J. W.* which please to place to account as advised of.

Your most Obed. Serv.
(Signed) *J. Femminick* & *A. H. C. Sharingh*.

"On *Imp. Neun*, *Wieze*, *Wiegman*, executors of the estate of the late *Wiegerman*, esquire, deceased. In case of need to his excellency the general *Van Overstraten*."

And at the same time he was informed by one of the partners of the said house, that two guilders and an half, each guilder being equal to 40 cents current money of the *United States*, was the par exchange between the rix dollar of *Holland* and the rix dollar of *Batavia*. That *Purviance* having read the translation, a receipt for the bills written in the *English* language was presented him by the *Willinks*, viz. "Received from Messrs. *W.* & *J. Willink* three sets of bills of exchange on *Batavia*, to the amount of thirty thousand rix dollars," which he signed and delivered to the *Willinks*, receiving from them at the same time the said bills, being under the impression that they would be paid to him in hard dollars of the value of 2½ guilders *Holland* currency, being the par value of *Spanish* milled dollars. That the ship *Union* on the 19th of August 1801, proceeded on her voyage to *Batavia* with the said supercargo on board, and arrived there on the 7th of February 1802. Soon after which said bills were presented by *Purviance* for acceptance, who then learned for the first time that the bills being drawn in rix dollars were, according to their tenor, payable in the currency of *Batavia*, and would produce no more than $22,000 *United States* currency, and would only be paid at that rate. That finding this to be true, *Purviance* did accordingly receive payment of them at that rate and to that amount, and was thereby disappointed of $7,500 of the funds which he had expected in *Batavia*, and which were necessary for the purposes of completing the cargo of the ship, and in consequence thereof he invested only the said sum of $22,500 in a return cargo for the ship, which was not sufficient to fill her by the deficiency of $7,500, and dispatched her to *Baltimore*. After which he returned to *Amsterdam*, where a correspondence by letters took place between him and the

1816.

Smith
vs
Gilmor

*Willinks*, which letters the plaintiffs gave in evidence. They further gave in evidence that pending the negotiation for the bills, *Purviance* did clearly and explicitly explain to the *Willinks* that it was his desire and intention to contract for and purchase bills to the amount of 30,000 *Spanish* milled dollars; and that this sum was necessary for the purchase in *Batavia* of a return cargo for the ship; that *Purviance* did believe that the *Willinks* so understood him; that in answer to his inquiries as to the value of the rix dollar, as specified in his letter to the *Willinks* of the 29th of July 1801, they assured him that it was 2½ guilders, of a guilder *Holland* currency, to the rix dollar. They further offered in evidence that a florin and a guilder in *Holland* mean the same thing, and are a denomination of money consisting of 20 stivers; that the denomination of florin is not used in *Batavia*, and that the par of exchange between money of the *United States*, and money of *Holland* is 40 cents to the guilder, 2½ of which make a rix dollar of *Holland*. They further read in evidence a letter to them from the *Willinks*, dated the 15th of September 1802 on the subject of the purchase of the said bills for their use, viz. "With respect to the bills we procured to Mr. *Purviance*, we endeavoured to convince him during his last stay here of the impropriety of his claim, on the supposed error in said bills of exchange on *Batavia*. When he asked for $30,000, of f. 2½ each, we answered they could be purchased, but explained to him by mouth accurately that bills on *Batavia* were always drawn in rix dollars at 48 stivers, and obtained a discount more or less as could be agreed on. Whereupon he ordered 30,000 rix d. to be bought, as was duly performed at a discount of 12 *per cent*. At the delivery of the bills drawn in Rx. D. at 48 st. each, he acknowledged their receipt and was fully satisfied with them. If therefore people in *Batavia* had refused to pay 30,000 *Spanish* milled dollars, and he had supposed the drawers committed an error, his duty had called him not to receive any money, but have the bills protested, to sue the drawers in *Amsterdam* on his return; but having received the money, and having parted with the bills, he gave up the whole of his right, if any, and has no title now to form any demand. However, to evince you gentlemen he has not sustained a loss as he seems to suppose, we shall give you as a proof the following statement. Mr. *Purviance* paid for the bills of Rx. D. 30,000                                f. 63,360

| | | |
|---|---|---|
| Deducting ½ p. c. with brokerage | 31 14 | |
| And 10 p. c. insurance | 6,336 | |
| | | 6,367 14 |
| | | 56,992 6 |

For which sum Mr. *Purviance* could have purchased at 51½ sti. as the price was for *Spanish* dollars          $22,130
And he has received in *Batavia*          22,500

                                        Profit          370

And if we calculate 15 p. c. premium of insurance, as must have been paid at that time, as will appear by the inclosed affidavit, it was a profit of 5 p. c. more. Could thus any man in his senses suppose Mr. *Purviance* would have obtained bills to be paid with 30,000 *Spanish* milled dollars which stood him only at 42⅝, when dollars in specie were paid at 51½ sti.—It is impossible to believe it." And also an account current transmitted to them by the *Willinks* relative to the said purchase viz. "1801, Aug. 20. To furnished bills on *Batavia* to Mr. *Purviance*.    Rx. D, 30,000 at 48 st. deduct 12 p. c. discount    63,360

Our commission on the purchased bills f.63,360

| | | |
|---|---|---|
| at 1 p. c. | 633 | 12 |
| Interest of our advance at 5 p. c. | 208 | 12 |
| Postage of letters | 4 | 4 |

64,206 8" .

The plaintiffs also gave in evidence, that money is never taken up on loan at *Batavia*, by drawing bills on *Holland*, unless the funds taken out in the vessels trading there are sufficient to complete their return cargoes; and that the supercargoes, to enable them to obtain money in that mode, must have a special authority from their owners in *America*, and who must also enjoy a good credit; that no vessels ever sail from *America* under the expectation of being able to obtain funds for the purpose of purchasing their return cargoes; and that it is very uncertain when money may be procured on bills at *Batavia*, and that money cannot at all times be procured on bills. They further offered in evidence, that although the word " *Dollar*" is not known in the *Dutch* language, nor is a coin in *Holland;* yet the word *Dollar* is used there among merchants, and is well known by them as meaning a *Spanish* milled dollar, or the dollar of the *United States*, and that the *Willinks* so understood it. The defendants then gave in evidence, that *W.* and *J. Willink* are natives of *Holland;* that the word *Dollar* is not a word known in the *Dutch* language, or in use among the merchants of *Amsterdam;* that there is no such coin or currency in *Holland* or *Batavia*, as a Dollar; that the rix dollar of *Holland* contains 50 stivers, equal to 2½ guilders and florins, and is worth a dollar *United States* currency; that a rix dollar of *Batavia* contains 48 stivers only, and is worth no more than 75 cents currency of the *United States*, when paid in silver, but when paid in paper money of *Batavia*, is of considerably less value; that when the term rix dollar is used in *Amsterdam* in a bill on *Batavia*, it means a rix dollar of *Batavia* currency, and is payable in the paper money of *Batavia*, unless it be specified in the bill to be " *heavy stivers*," in which case it is payable in silver, and is then worth 75 cents as aforesaid; that this is the usual custom and course of trade in *Amsterdam* relative to the drawing of bills on *Batavia*, where accounts are kept in rix dollars and stivers. 48 stivers to the rix dollar; that *Spanish* milled dollars in *Amsterdam* are, and in eve-

ry part of the year 1801, and before and since, were an article of merchandize, and not a denomination of money; that as an article of merchandize, its value fluctuates in the market of *Amsterdam*, from 48 to 53 stivers, *Holland* currency, to the *Spanish* dollar; that on the 18th of August, 1801, the market price of a Spanish milled dollar in *Amsterdam*, was 51½ stivers *Holland* currency, and the market price of bills on *Batavia* in rix dollars, payable in heavy stivers, was 48 stivers, *Holland* currency, to the rix dollar of *Batavia*, with a discount or abatement of 12 per cent. being the price at which the *Willinks* purchased the said bills; that the said bills were purchased on the most advantageous terms on which such bills could then be obtained; that the sum paid therefor was 63,360 florins, *Holland* currency, of which *Purviance* was informed at the time when the bills were presented to him by the *Willinks*, and received by him as aforesaid; that he at that time knew and was informed that the said bills were for 30,000 rix dollars on *Batavia*, and with that knowledge consented to receive, and did receive them as aforesaid; that in the purchase of the said bills, and in all the preparatory negotiations and arrangements concerning that purchase, the *Willinks* acted fairly and honestly as agents, laid out the money of the plaintiffs to the best advantage, and had no interest whatever in the transaction, except a commission of one per cent for the purchase on the sum invested; that in the previous correspondence between them and *Purviance*, relative to the price and amount of bills to be purchased on *Batavia*, they had no interest or intention to deceive him, or lead him into any error or mistake; and when they purchased and delivered to him the bills in question, supposed that they had fully executed the commission which he had given them. The defendants further offered in evidence, that the insurance of money from *Holland* to *Batavia* was, in and about the year 1801, six *per cent*, which with charges, and the premium, would then have amounted to 7½ p. c. on the sum transported. That the plaintiffs had not at that time any *Spanish* dollars in *Holland*, but must have purchased them; that they resolved to send them to *Batavia*, and must have paid for them at the rate of 51½ stivers *Holland* currency to the dollar; and that money may be, and in February 1802 might have been obtained in *Batavia* for about 15 p. c. premium, by drawing bills on *Amsterdam*, which at that time was a customary mode of raising money there to complete return cargoes to *America*. The defendants further offered evidence to prove, that the information given by the *Willinks* to *Purviance*, relative to the value of the rix dollar of *Batavia*, and the par of exchange between *Holland* and *Batavia*, if given at all, was not given at the time of his receiving from them the bills, but at the time of writing their answer to his letter of the 29th of July 1801, and that no such information was given by them to him. The defendants further offered in evidence, that it is usual in voyages from the *United States* to

1816.

Smith
vs
Gilmor

*Batavia,* either direct or by the way of *Europe,* for the supercargoes to be furnished with authority to draw bills in *Batavia* for the purpose of raising money there, to make up their return cargoes; which custom arises from the danger always existing, that the funds carried out may prove deficient. That the supercargoes of houses in the *United States* of established and known credit, and known in *Batavia,* may dispose there of their bills on their employers for the above purposes, and on the usual terms; and that *Purviance,* as the agent of the plaintiffs, might have disposed of bills on them at *Batavia* on the usual terms, for the purposes aforesaid, without any special authority for that purpose from them. The defendants then prayed the opinion to the court, and their direction to the jury, that the true meaning and construction of the letter from the *Willinks* to *Purviance* of the 29th of July 1801, is to inform him, that bills on *Batavia* to the amount of 75,000 florins, *Holland* currency, or $30,000 currency of the *United States,* might be purchased at the rate and price of 48 stivers *Holland* currency for each rix dollar of *Batavia.* But the Court, [*Hollingsworth,* A. J.] was of opinion, and so directed the jury, that the answers of the *Willinks* gave *Purviance* reason to believe, that an investment of 75,000 florins *Holland* currency, or $30,000 money of the *United States,* might be made in bills on *Batavia,* drawn according to the usual course of trade in rix dollars; that for each rix dollar, for which the bills should be drawn, the purchaser would have to pay 48 stivers *Holland* currency; and the value of the rix dollar, thus drawn for, was $2\frac{1}{4}$ florins *Holland* currency. The defendants excepted.

2. The defendants then gave in evidence the above opinion delivered by the court to the jury, and assented to by the plaintiffs. The defendants then prayed the opinion of the court, and their direction to the jury, that the order given by *Purviance* to the *Willinks,* to purchase bills of exchange for the use of the plaintiffs, and the undertaking of the *Willinks* to execute that order, did not bind them to procure those bills at any other price than what might be then the fair market price of such bills in *Amsterdam.* Which direction the court refused to give, being of opinion that the *Willinks* were obliged to purchase according to the terms they had stated to *Purviance,* or not to have purchased at all, provided the jury believe that the *Willinks* were authorized by *Purviance* to purchase the bills for him on the terms aforesaid, and none other. The defendants excepted.

3. The defendants further prayed the direction of the court to the jury, that the said order and undertaking did not bind the *Willinks* to procure, for the use of the plaintiffs, bills which would produce in *Batavia* the sum or value of 30,000 *Spanish* dollars. On this prayer the Court [*Hollingsworth* and *Jones* A. J.] was divided in opinion,

and therefore refused to grant it. To this refusal, both the parties, plaintiffs and defendants, excepted.

4. The defendants further prayed the court to direct the jury, that if the jury shall be of opinion, from the evidence, that *Purviance*, when he received the said bills from the *Willinks*, knew them to be bills on *Batavia* for 30,000 rix dollars, and knew the sum of money for which they had been purchased; and that the *Willinks*, in making that purchase, undertaking the execution of the order, and giving the information on which it was founded, acted fairly and with good faith, and procured the bills on as advantageous terms as they could then have been obtained; that then the acceptance of the bills by *Purviance* was an assent to, and affirmation of, the said purchase. On this prayer the court, two judges only being present, was again divided in opinion, and therefore refused it. The plaintiffs and defendants excepted.

5. The defendants further prayed the court to direct the jury, that if the jury shall be of opinion from the evidence, that when the *Willinks* received the said order, and undertook to execute it, they understood their letter of the 29th of July, 1801, to mean, that bills on *Batavia* to the amount of 75,000 florins, *Holland* currency, or $30,000 currency of the *United States*, at 2½ florins to the dollar, might be purchased at the rate of 48 stivers *Holland* currency, for each rix dollar of *Batavia*, in heavy stivers, with a discount of 10 or 12 *per cent.* and did intend their said letter to be so understood at the time of writing it, then and in that case, they are not responsible for having purchased the bills at that price. This prayer the court also refused, being divided in opinion, two judges only being present. Both the plaintiffs and defendants excepted; and the verdict and judgment being for the defendants, the plaintiffs appealed to this court.

The cause was argued at December term, 1812, on the *third, fourth,* and *fifth* bills of exceptions, before Bu-chanan, Earle, and Johnson, J. by

*Martin* and *Pinkney,* (Attorney General *U. S.* ) for the Appellants, and by

*W. Dorsey* and *Harper,* for the Appellees.

As a preliminary question it was urged by the appellees' counsel, that by the act of October 1778, *ch.* 21. s. 14, any person affected by a division of the court might except. That by the division of the court in this case the appellees alone were affected, as the prayers in the *third, fourth* and *fifth* bills of exceptions, which are the only exceptions now before the court, were made on the part of the appellees, and the court being divided in opinion, were not granted; and by the refusal of the court to grant the prayers, the

law was left to the jury, and this was acquiesced in by the plaintiffs below. That no advantage could be taken by the appellants of the refusal of the court to grant the prayers of the defendants. That if the plaintiffs below had made contrary prayers to the court, and the court being divided, refused to grant them, then they might have excepted, and by their appeal asked a revision by this court; but having neglected to do so, they were now wholly precluded.

The counsel for the appellants contended, that the plaintiffs below were affected by the refusal of the court to declare the law on the defendants' prayers. That before the act of 1778, *ch*, 21, either party might except, if the court refused to give an opinion on a prayer submitted to them. That there could be no reason why the plaintiffs should be compelled to call on the court for the converse directions to the jury, when the court had been divided in opinion, and had refused to give those asked for by the defendants, either for or against the plaintiffs. It would have been giving the court unnecessary trouble, and a waste of its time, for the plaintiffs to have thus acted. Here the court below was composed of two judges, one of them for giving, and the other for refusing to give the directions prayed, and the plaintiffs excepted to the opinion of that judge who was for giving the directions as prayed by the defendants. That if the plaintiffs had applied for directions, the opposite of those asked for by the defendants, the court would have been still divided, and no directions would have been given, and the law would have remained unsettled; and it amounted precisely to the same thing as if left on the refusal to grant the defendants' prayers.

BUCHANAN, J. delivered the opinion of the court. The court are of opinion, that the applications of the defendants below, as stated in the *first* and *last* bills of exceptions, taken on the part of the plaintiffs below, (being the 3d and 5th taken at the trial of the cause) ought to have been rejected; that the direction asked for as stated in the *second* bill of exceptions taken by the plaintiffs below, (being the 4th in the record,) ought to have been given, and therefore reverse the judgment of the county court, dissenting from the opinions of that court on each of those bills of exceptions.

He stated that he differed in opinion with the other judges as to the preliminary question. He was of opinion that the case was not before the court under the bills of exceptions.

JUDGMENT REVERSED.

A *procedendo* was awarded, and the cause remitted to the county court for a new trial.

6. A new trial was had in the county court at March term 1814, and a verdict given for the plaintiffs for $12,775 current money, damages. A motion was made by

1816.

Smith
vs
Gilmor

the defendants in arrest of judgment, because no declaration had been filed in the cause. The county court sustained the motion, and arrested judgment on the verdict; and the plaintiffs appealed to this court.

The cause was argued at this term before BUCHANAN, EARLE, JOHNSON, and MARTIN, J.

*Martin* and *Winder*, for the Appellants. They referred to the acts of 1715, *ch.* 40, s. 3, and 1795, *ch.* 56, s. 3. and *Campbell vs. Morris*, 3 *Harr. & M·Hen.* 535, in which no declaration was filed, and which was a case much contested.

*Harper*, for the Appellees.

JUDGMENT REVERSED, and judgment entered on the verdict of condemnation for $12,775 current money, damages, and $1975 93 current money, additional damages assessed by the court, and costs.