545 A.2d 658

Elaine GEISZ, Pers. Rep. of the Estate of Steven F. Geisz, and as Mother and Next Friend of Steven Geisz II

v.

GREATER BALTIMORE MEDICAL CENTER, George J. Richards, Jr., M.D., and Richards, Hirschfeld & Associates, P.A.

No. 131, Sept. Term, 1987.

Court of Appeals of Maryland.

Aug. 5, 1988.

302 

Howard A. Janet and Diane G. Goldsmith (Stephen L. Snyder and Snyder & Janet, on brief), Baltimore, for appellant.

Roy L. Mason (Mary Alane Downs, Susan A. Polis, and Donahue, Ehrmantruat & Montedonico, Chartered, on brief), Baltimore, Mark D. Gately (argued) (Timothy L. Mullin, Jr., Mark A. Wesker and Miles & Stockbridge, on brief), Baltimore (Joseph C. Wich, Jr., Kathleen Gallogly Cox and Cook, Howard, Downes & Tracy, on brief), Towson, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

RODOWSKY, Judge.

This wrongful death and survival action alleging medical malpractice was filed more than ten years after the patient died of cancer. Injury to the patient occurred before the earliest statute of repose for medical malpractice claims

was enacted. Consequently, the issue as to the survival claim is whether it is barred under the discovery rule of the general three year statute of limitations. We shall hold that it is not barred. Whether the wrongful death claim was timely turns on the applicability of Md.Code (1974, 1984 Repl.Vol.), § 5–203 of the Courts and Judicial Proceedings Article (CJ) which reads:

> If a party is kept in ignorance of a cause of action by the fraud of an adverse party, the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered the fraud.[1]

We shall hold that § 5–203 applies to the facts here.

## I

The plaintiffs' decedent, Steven F. Geisz (Geisz), died at age twenty-nine, on September 21, 1975, of Hodgkin's disease. He was survived by his son, Steven Geisz, II (Steven), born April 1, 1972, and by Elaine Geisz (Elaine), his former wife and Steven's mother, from whom Geisz had obtained a divorce a few months before his death. Slightly more than three years after the marriage, Geisz was diagnosed as having Hodgkin's disease. Proper treatment of that cancer enjoys a high success rate according to the plaintiffs' experts.

On November 26, 1971, Geisz first came under the care of Dr. George J. Richards, Jr. (Dr. Richards), one of the defendants, who was the Director of the Radiation Therapy Department at Greater Baltimore Medical Center (GBMC),

---

1. Unless otherwise noted all references to the CJ Article are to the 1984 replacement volume.

 By Ch. 592 of the Acts of 1987 the introductory conditional clause of § 5–203 was amended to read: "If the knowledge of a cause of action is kept from a party by the fraud of an adverse party...." No party to the instant action, however, argues that the 1987 amendment to CJ § 5–203 has any bearing on the construction of the immediate predecessor statute or on its application to the facts presented here.

another defendant.[2] Between November 1971 and November 1973 Geisz received, usually from technicians acting at the direction of, and under the supervision of Dr. Richards, courses of treatment which the plaintiffs allege were improperly conceived and administered. By November 1973 Geisz was beyond help by conventional methods. Dr. Richards referred Geisz to a program, operated independently of the defendants, in which experimental drugs were administered.

In early 1985 Elaine consulted counsel as a result of her having read a newspaper article concerning malpractice actions instituted against Dr. Richards. Geisz's probate estate was reopened and Elaine was appointed personal representative. On November 18, 1985, this action was filed. As personal representative Elaine asserts, pursuant to CJ § 6–401(a) and Md.Code (1974), § 7–401(x) of the Estates and Trusts Article, a "personal action which the decedent might have commenced or prosecuted" (the survival claim). As mother of Steven, and for his benefit, she also claimed pursuant to CJ §§ 3–901 through 3–904 (the wrongful death claim). Defendants moved for summary judgment on the ground that the claims were time barred.

The statute of limitations relevant to the survival action is CJ § 5–101 which provides that "[a] civil action at law shall be filed within three years from the date it accrues...." When a survival claim "accrues" is determined by the discovery rule. *See Trimper v. Porter–Hayden,* 305 Md. 31, 501 A.2d 446 (1985); *Poffenberger v. Risser,* 290 Md. 631, 431 A.2d 677 (1981); *Waldman v. Rohrbaugh,* 241 Md. 137, 215 A.2d 825 (1966). *See also Southern Maryland Oil Co. v. Texas Co.,* 203 F.Supp. 449, 451–52 (D.Md.1962); *Hahn v. Claybrook,* 130 Md. 179, 100 A. 83 (1917). Analysis of the timeliness of the wrongful death claim begins with CJ § 3–904(g) which provides that a wrongful death claim "shall be filed within three years

---

**2.** Dr. Richards's professional association, Richards, Hirschfeld & Associates, P.A., is also a defendant.

after the death of the injured person." Under *Trimper v. Porter–Hayden, supra,* the discovery concept of accrual, judicially created by interpreting CJ § 5–101, does not apply to CJ § 3–904(g).[3]

Elaine contends that she did not "discover" the causes of action until she read a newspaper article describing one or more malpractice actions filed against Dr. Richards and that discovery is the sole manner in which this survival claim can accrue. In plaintiffs' view death is not an accrual.

Plaintiffs submit that the wrongful death action is also timely because fraud kept Elaine in ignorance of the cause

---

**3.** No party argues that the statute of repose applicable to medical malpractice actions directly governs either the wrongful death or survival claims asserted here.

When the instant action was brought the medical malpractice statute of repose, CJ § 5–109, was in the form enacted by Ch. 235 of the Acts of 1976. It provided in relevant part that "[a]n action for damages for an injury arising out of the rendering of or failure to render professional services by a health care provider ... shall be filed (1) within five years of the time the injury was committed or (2) within three years of the date when the injury was discovered, whichever is the shorter." Uncodified § 5 of Ch. 235 provided that the act applied only to "medical injuries occurring on and after" July 1, 1976.

Chapter 235 also enacted the Health Care Malpractice Claims Act, CJ Title 3, Subtitle 2A. In *Oxtoby v. McGowan,* 294 Md. 83, 447 A.2d 860 (1982), a medical malpractice case in which the issue was whether the claim was subject to arbitration, we interpreted "injuries" as employed in the effective date clause of Ch. 235 to mean an invasion of a legally protected interest coupled with some harm. *Oxtoby* involved a claim that an operation negligently performed prior to July 1, 1976, caused the patient to develop cancer which manifested itself after July 1, 1976. The patient died of cancer after filing suit against the surgeon. We held that the wrongful death and survival claims into which the patient's action had been amended were based on a medical injury occurring before July 1, 1976, and that they were not subject to arbitration.

*Hill v. Fitzgerald,* 304 Md. 689, 501 A.2d 27 (1985) involved the medical malpractice statute of repose which was the predecessor to Ch. 235 and which had been enacted by Ch. 545 of the Acts of 1975. The effective date clause of the 1975 enactment made it applicable to "injuries occurring after July 1, 1975." The patient was the plaintiff in *Hill. Hill* applied the *Oxtoby* rationale to conclude that that action was not governed by the 1975 medical malpractice statute of repose.

of action. They rely on Elaine's deposition testimony that Dr. Richards made certain statements which kept them in ignorance of the cause of action and which are set forth in part II, *infra*. Plaintiffs contend that these statements were a fraud within the meaning of CJ § 5–203 and that § 5–203 operates to toll the time for filing a wrongful death action. Consequently, plaintiffs assert that the three year period for bringing this wrongful death claim is measured from discovery of the fraud and not from Geisz's death.

The defendants contend that Geisz and Elaine had knowledge of facts constituting discovery as a matter of law no later than November 1973 when Dr. Richards stopped treating Geisz. Specifically with respect to the survival claim, the defendants rely on *Trimper v. Porter–Hayden, supra,* in which we held that under CJ § 5–101 a survival action predicated on latent disease accrued at death. The defendants argue from the *Trimper* reasoning that, even if there has been no discovery by a plaintiff, a survival action which is predicated on medical malpractice and not governed by the medical malpractice statute of repose similarly accrues at death as a matter of law. The defendants contend that the fraud statute, CJ § 5–203, does not apply to a wrongful death claim and, in any event, deny that the statements attributed to Dr. Richards constitute fraud within the meaning of CJ § 5–203.

The Circuit Court for Baltimore County entered summary judgment for the defendants and the Court of Special Appeals affirmed. *Geisz v. Greater Baltimore Medical Center,* 71 Md.App. 538, 526 A.2d 635 (1987). The circuit court, relying on *Trimper,* held that the survival action accrued as a matter of law on the death of Geisz and the Court of Special Appeals agreed. The circuit court further held that the plaintiffs had failed to show facts which would permit a finding of fraud under CJ § 5–203 so that the right to bring a wrongful death action ended three years after Geisz's death. The trial court nevertheless specifically addressed the issue of due diligence and concluded that a jury question was presented as to whether the plaintiffs should

have discovered the claims earlier. The Court of Special Appeals assumed that the summary judgment record could support a finding of fraud and implicitly assumed that fraud under § 5–203 tolled the running of the time within which a wrongful death action must be brought. But the intermediate appellate court held that Elaine and Geisz "by the exercise of ordinary diligence should have discovered the fraud" more than three years prior to the filing of the wrongful death claim.

We granted petitions and cross-petitions for certiorari which raise the issues described above.

## II

The facts most favorable to the timeliness of the plaintiffs' claims are presented in this part II.

In October 1971 Geisz had developed a persistent cough. He saw his general physician who detected a lump in his chest. Within two weeks Geisz was operated on at GBMC. A biopsy of the excised lump revealed Hodgkin's disease. The surgeon told Geisz to start radiation treatment immediately at GBMC.

Geisz first met with Dr. Richards, the chief of radiation therapy at GBMC, on November 26, 1971. Elaine was present at that meeting and on every other occasion when Geisz had conversations with Dr. Richards at GBMC. At the first meeting Dr. Richards discussed Geisz's illness and told him that he would begin radiation treatment and probably receive chemotherapy as well. Dr. Richards told the couple that Geisz had a 95% chance of being cured. Elaine asked Dr. Richards if they should go to Sloan–Kettering or to Johns Hopkins. Dr. Richards assured them that GBMC had the best that there was to offer, that GBMC was treating people with the most up-to-date techniques and that the survival rate of patients treated at GBMC was very good. He saw no reason for them to go to New York or to change hospitals.

Beginning on the first day of consultation with Dr. Richards, and continuing through January 20, 1972, Geisz received an initial course of radiation therapy. As revealed by the unsworn, written reports of the plaintiffs' medical experts which were included in the summary judgment record without objection, the plaintiffs' theory of liability is, in part, that radiation was not applied to all of the affected area or, if applied, was applied in insufficient dosages.

In March 1972, Dr. Richards began Geisz on chemotherapy which made him extremely nauseous. On April 17, 1972, Dr. Richards caused a Gallium Scan to be performed on Geisz for the first time. It revealed that the disease was spreading. Discussing the test results with Geisz and Elaine, Dr. Richards said that he would make the treatment stronger and that the chances of cure were 90%.

A second round of radiation treatment was administered between May 25 and August 6, 1972. When, by the fall of 1972, Geisz had made no progress toward a cure, the couple again consulted with Dr. Richards. In substance he said that Geisz was getting the best treatment. The couple was given the impression that Geisz was simply in the lower end of the statistics but that Dr. Richards was going to try something else to beat the disease. They remained totally confident in Dr. Richards. For example, when asked about possible conversations during this period with other patients of Dr. Richards, Elaine testified:

> We would be in the x-ray room waiting for treatment, there always seemed to be a room full of patients. It was a very small room, and just seemed to be people waiting there all of the time. For the most part, people didn't talk a lot, but it seemed like everybody there had the feeling that they had their trust in him like we did. We looked up to Dr. Richards as if he was a God for us and he was, he was going to help us get through this.

There was more chemotherapy beginning in February 1973. In the summer of 1973 Geisz's persistent cough became worse. Diagnostic x-rays revealed that the sac around Geisz's heart was filling with fluid so that he would

require surgery. Geisz and Elaine knew that this condition resulted from radiation treatment, but Elaine states that they believed the condition to have been a natural consequence of the series of treatments necessary to attack the cancer. Indeed, she testified on deposition that the heart surgeon told her that this could be an aftereffect of the radiation.

In November of 1973 the couple had their last meeting with Dr. Richards. According to Elaine, he told them that

for whatever reasons, we were at the low end of the statistics and he had given us every treatment available in the country, the best of the treatments, and [Geisz] was not responding. There were no answers why, he said that he had given us everything available and that he'd like us to go to the Cancer Research Center....

That facility "would only accept patients who had been given up as hopeless."

Geisz underwent surgery to remove the fluid from around his heart in the fall of 1973 at University Hospital.

There is no evidence that any health care provider at GBMC, at University Hospital or at the Cancer Research Center ever indicated to the couple, or either of them, that Geisz had received other than proper, albeit unsuccessful, treatment while under the care of Dr. Richards.

The plaintiffs also rely on testimony of Dr. Richards given in a deposition taken in another case pending against him, his professional association and GBMC (the *Burton* case). The deposition in *Burton* was concerned with the year 1972 and was taken in March of 1985, approximately four years after Dr. Richards had "resigned" from his position at GBMC. A large part of the interrogation by Burton's counsel concerned allegations which Dr. Richards had made in a crossclaim against GBMC in yet another patient's lawsuit. In the case *sub judice* the plaintiffs assert that deposition answers by Dr. Richards in *Burton* demonstrate either an intentionally fraudulent concealment of these plaintiffs' causes of action or that the statements

reviewed above were misrepresentations made with a reckless disregard for their truth or falsity.

Dr. Richards deposed that when the GBMC radiation therapy department opened in 1965 it was understaffed in that there were only "two technologists with two machines whereas [the department] should have had four technologists with two machines." As the hospital began to function and income improved, there was no real change in the staffing patterns despite multiple requests by Dr. Richards for increased staff. He did not believe that patients were neglected as a result of the lack of staff; rather, understaffing made it much more difficult to take care of the patients. Existing staff had to work longer hours and work harder.

He also believed that his department was underequipped in that he operated the department with one super voltage unit until late 1974. Nevertheless, in his opinion the dedication of the people working there offset the lack of requested additional equipment. The most common complaint about the department was the wait between a patient's appointment time and actual treatment. Some appointments had to extend into the early evening hours.

Without identifying any specific incident, Dr. Richards admitted that there were instances when his staff did not take portal films when he had requested that it be done. A portal film is a means of verification that radiation is in fact reaching into the areas of a patient intended for radiation. Dr. Richards stated that he usually picked up the failure to take portal films and corrected it so that it did "[n]ot really" impact on the quality of care being administered.

One of the positions in the department was that of physicist. At GBMC there was a part-time physicist who worked at least two days per week. When the physicist was not available Dr. Richards had to perform those duties. He acknowledged that the lack of a full-time physicist affected his ability to monitor and supervise members of the department. It is also Dr. Richards's opinion that the

medical board and board of trustees of GBMC "most certainly failed to properly safeguard and preserve the records" of the radiation therapy patients.

On deposition Dr. Richards readily agreed that the anatomical diagrams made by his staff to record treatment fields were sloppy and in no way represented the true areas of treatment. He further said, however, that he personally set up every patient's initial treatment and every change in the field of treatment.

The application of radiation therapy is to the patient, not to an anatomical diagram and on the patient's body there would be indelible paintings of the actual fields of treatments so that the machines were aimed and calibrated to the actual treatment field on the patient.... So at no time did the patient ever receive treatment that did not have clear cut markings which were verified either by a direct physician's verification or by a port film to assist the physician in the verification.

The plaintiffs' medical experts concluded in their reports that treatment plans, calculations of dosages, and portal films were not done.[4] We shall refer to these reports in greater detail in part IV B, *infra.*

### III

### A

"The burden which the defendants assumed by their motion [for summary judgment] was to show that there was no dispute of any fact material to the limitations

---

4. These conclusions seem to have been based on the absence of indications in the medical records that those procedures were performed. In *Burton* it appears that the medical files similarly failed to contain records of those procedures. Dr. Richards on deposition categorically testified that the procedures had been performed and blamed sloppy records maintenance or a records destruction program for the lack of a paper trail. The plaintiffs do not argue that the procedures were performed, with records thereof contemporaneously made and thereafter destroyed in order to conceal evidence of negligence.

issue and that they were entitled to judgment on limitations grounds as a matter of law." *O'Hara v. Kovens*, 305 Md. 280, 286, 503 A.2d 1313, 1316 (1986). We shall first consider if the plaintiffs failed, as a matter of law, to exercise due diligence.[5] This record does not support ruling that, more than three years before the survival action was brought, Geisz or Elaine had

> " 'knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry [thus, charging the individual] with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued.' " [*Poffenberger v. Risser, supra*, 290 Md. at 637, 431 A.2d at 681 (quoting *Fertitta v. Bay Shore Dev. Corp.*, 252 Md. 393, 402, 250 A.2d 69, 75 (1969)) (quoting *Blondell v. Turover*, 195 Md. 251, 257, 72 A.2d 697, 699 (1950)).]

Defendants emphasize that the couple knew that, although the rate of cure for Hodgkin's disease was very

---

**5.** On an appeal from the grant of a summary judgment which is reversible because of error in the grounds relied upon by the trial court the appellate court will not ordinarily undertake to sustain the judgment by ruling on another ground, not ruled upon by the trial court, if the alternative ground is one as to which the trial court had a discretion to deny summary judgment. For example, a motion might be denied in order to allow the party opposing the motion a further opportunity through discovery to present a triable issue of fact. *See Metropolitan Mtg. Fund v. Basiliko*, 288 Md. 25, 415 A.2d 582 (1980). Thus, in *Henley v. Prince George's County*, 305 Md. 320, 503 A.2d 1333 (1986), a case of alleged negligent hiring, we reversed a summary judgment for a defendant because, contrary to the trial court's conclusion, we found a triable issue of hiring. We would not, however, consider if a lack of proximate cause was an alternative support for the judgment because "[t]he effect of our ruling on the issue of proximate cause, or on any other issue not considered by the trial judge, would be to deprive the trial judge of discretion to deny or to defer until trial on the merits the entry of judgment on such issues." *Id.* at 333, 503 A.2d at 1340. Here the trial court exercised its discretion to rule on the summary judgment merits of the due diligence issue. It refused to continue the summary judgment hearing to permit additional discovery; the court heard argument for four days on the limitations motions in this and related cases after which it granted summary judgment for the defendants in this case; and the trial court ruled that the due diligence issue was for the jury.

high, Geisz's condition nevertheless continued to deteriorate to the point where Dr. Richards considered the case to be hopeless and sent Geisz to the Cancer Research Center. In addition the patient and Elaine knew at the same time that the radiation treatments had caused a buildup of fluid around Geisz's heart. But Maryland appellate cases have required clearer and more definitive indications of malpractice than are presented here before holding that limitations bar the claim as a matter of law.

For example, in *Hahn v. Claybrook, supra,* the plaintiff alleged that the defendant physician had negligently prescribed a drug which, when taken in the prescribed quantities, had caused the plaintiff's skin to become discolored. The treatments had begun in 1904 and, although the plaintiff's skin had turned blue by 1908, the plaintiff delayed suit until 1915. The patient in *Decker v. Fink,* 47 Md.App. 202, 422 A.2d 389 (1980) complained that her psychiatrist had sexual relations with her during the course of a psychoanalysis which ended in 1971. In 1973 another psychiatrist told the plaintiff that the defendant's method of treatment violated medical standards. A suit filed in 1977 was barred by limitations as a matter of law despite the plaintiff's contention that she had been influenced in the interim by the "transference phenomenon."

Although the issue primarily presented in *Johns Hopkins Hosp. v. Lehninger,* 48 Md.App. 549, 429 A.2d 538, *cert. denied,* 290 Md. 717 (1981) was whether equitable estoppel, not amounting to fraud, would prevent asserting limitations, the starting point for the discussion was the legal conclusion that limitations otherwise barred the suit. The plaintiff claimed a failure to diagnose deterioration of the neck of his right femur but a few days after the alleged misdiagnosis, the defendant had described possible complications to the plaintiff, including bone disintegration due to disruption of the femur's blood supply. In a case of alleged malpractice involving the setting of a broken ankle by the defendant doctor, limitations began to run as a matter of law when, more than three years before suit was filed, a

different doctor examined the plaintiff's ankle, told her it was "all messed up" and asked her " 'who the hell told you to walk on that ankle?' " *Lutheran Hosp. v. Levy,* 60 Md.App. 227, 233, 482 A.2d 23, 25 (1984), *cert. denied,* 302 Md. 288, 487 A.2d 292 (1985).

The facts in the matter before us are not as strong for a limitations bar as are the facts in the cases reviewed above. Indeed, the facts in the instant case are not as strong for a limitations bar as were the facts in *Baysinger v. Schmid Prods. Co.,* 307 Md. 361, 514 A.2d 1 (1986) where we reversed a summary judgment and held that the limitations defense presented a factual question. Mrs. Baysinger had begun using, in May 1979, an intrauterine contraceptive device manufactured by the defendant which, as alleged in her suit filed in January 1984, had caused peritonitis and infertility. During a December 1979 hospitalization for peritonitis she asked her physician whether the defendant's product was responsible. Although the plaintiff had been suspicious that the device had caused her condition, she had also been concerned that the cause might be toxic shock syndrome or sexual intercourse. The doctor told her that intrauterine devices had been associated in medical literature with pelvic infection but that he had no way of determining whether her infection was caused by the device or by some other, unrelated cause. We held that reasonable minds could differ on whether the plaintiff should have pursued inquiry beyond that which she made of her physician. It was only *after* using the intrauterine device that Mrs. Baysinger developed abdominal and pelvic inflammation whereas Geisz had Hodgkin's disease *before* he was referred by his surgeon to Dr. Richards.

As head of the radiation therapy department at GBMC, Dr. Richards bore the indicia of competence to render, and supervise the rendering of, follow-up treatments to the cancer surgery. The many patients whom Geisz and Elaine observed waiting for treatment in Dr. Richards's department, it may be inferred, represented referrals by numerous physicians and reinforced the confidence that Elaine

and Geisz had in Dr. Richards. Elaine's evidence is that she and Geisz labored under the belief that, despite the best possible care, Geisz was unfortunately within the five to ten percent of Hodgkin's disease patients who did not respond to treatment. After treatment by Dr. Richards was discontinued in November 1973, nothing was said to Geisz or Elaine by those involved with the heart sac surgery or by those associated with the experimental drug program which raised any question about the quality of care provided by Dr. Richards.

A jury could conclude that the circumstances known to Geisz and Elaine would not cause reasonable persons in their position to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged malpractice more than three years before the survival claim was asserted. In *O'Hara v. Kovens, supra,* a variety of nonliability hypotheses could have explained the facts known to the *O'Hara* plaintiffs so that limitations was a fact question. Similarly here, cancer which was not responding to proper treatment, as contrasted with cancer which was being negligently treated, could have explained Geisz's deterioration and death. The instant record presents a factual setting in which it may be impossible for a lay person, unskilled in medicine, "reasonably to understand or appreciate that actionable harm has been done him." *Waldman v. Rohrbaugh, supra,* 241 Md. at 145, 215 A.2d at 830. On these facts, when the plaintiffs should have discovered the survival claim is a jury question.

## B

The defendants submit that, even if the facts known to Geisz and Elaine during Geisz's lifetime do not constitute discovery as a matter of law, accrual under CJ § 5–101 took place as a matter of law upon Geisz's death on September 21, 1975. This result is said to flow from the holding of *Trimper v. Porter–Hayden, supra,* that a survival claim predicated on a latent disease accrues at death. At all relevant times in *Trimper,* CJ § 5–101 was the only limita-

tions statute applicable to that survival claim.[6] We, however, refused to hold in *Trimper* that death is uniformly equated with discovery and that it therefore marks the time of accrual for all survival actions. We recognized that the judicial interpretations of "accrues" in CJ § 5–101 demonstrated a high degree of flexibility and that "the weight which one might assign to the competing, and indeed conflicting, [policy] considerations can vary depending on whether the case involves a latent disease, medical malpractice, strict products liability, lack of knowledge of the fact of death, or some other theory of liability or other factor." 305 Md. at 49, 501 A.2d at 456. Looking to the General Assembly's evaluation of the competing policy considerations, we noted that a wrongful death claim based on a latent disease would then have to have been brought within three years after death under the plain language of CJ § 3–904(g). Additionally, although at that time there was no statute addressing limitations specifically in latent disease tort cases, workers' compensation statutes required claims for disability or death resulting from an occupational disease to be filed within a fixed period from the date of disablement or death. Finding no indication of a policy to permit accrual under § 5–101 to be postponed after death until some indefinite time of discovery, and applying the policy of repose underlying all statutes of limitations, *Trim-*

---

**6.** After *Trimper* was decided, Ch. 624 of the Acts of 1987 added a new § 5–113 to CJ (1987 Supp.) under which "[a]n action for damages for a death arising out of an occupational disease [as therein defined] shall be filed within 3 years of the discovery of facts from which it was known or reasonably should have been known that an occupational disease was the proximate cause of death, but in any event not later than 10 years from the date of death."

At the 1986 session of the General Assembly, Ch. 374 amended the Wrongful Death Act to provide that "[i]f an occupational disease [as therein defined] was a cause of a person's death, an action shall be filed (1) within 5 years of the time of death or (2) within 3 years of the date when the cause of death was discovered, whichever is the shorter."

This 1986 provision, CJ § 3–904(g) (1986 Supp.), was further amended by Ch. 629 of the Acts of 1987 to extend the alternative period from five to ten years.

*per* held that an undiscovered, latent disease claim accrues no later than death.

In the case before us the statutory guidance concerning medical malpractice survival claims points to a public policy contrary to that applied in *Trimper.* Beginning July 1, 1975, § 5–109 established that an action for damages resulting from an "injury" arising out of the rendering of, or failure to render, professional services by a physician "shall be filed (1) within five years of the time the injury was committed or (2) within three years of the date when the injury was discovered, whichever is the shorter." Because Geisz's "injury" occurred between November 1971 and November 1973, no party argues that this medical malpractice statute of repose governs either claim in the instant action. *See* n. 3, *supra.* Nevertheless, the statute is of considerable assistance in applying the *Trimper* rationale under which we weigh policy considerations.

CJ § 5–109 clearly reinforces the policy of repose underlying all statutes of limitations and caps the discovery rule. But of significance for present purposes is that the bar at five years after injury deals with undiscovered claims while the three year period deals with claims which have been discovered. Thus, the undiscovered claim of a person who died from any cause a few days after the injury is not barred until five years after the injury. Under the medical malpractice statute of repose a survival claim which remains undiscovered for more than three years after the death of the patient may still be brought if instituted within five years of the injury. Death of the patient is not a factor affecting limitations under § 5–109. Consequently, a ruling that a malpractice claim, based on an injury occurring prior to July 1, 1975, and governed by CJ § 5–101, "accrues" no later than death could, in a given case, shorten the five year period which the General Assembly considers to be the appropriate time at which to cut off undiscovered malprac-

tice survival claims.[7]

█ Also significant is that when enacting the medical malpractice statute of repose the General Assembly could have fixed the time at which undiscovered, pre-existing claims would be barred, but did not do so. Arguably after *Hahn v. Claybrook* was decided in 1917, and certainly after *Waldman v. Rohrbaugh* was decided in 1966, the accrual of a medical malpractice cause of action under the general three year statute of limitations has been determined by the discovery rule. Prior to *Trimper* no Maryland decision had addressed how the death of the injured individual affected the discovery rule and the decisions in other states reflect a lack of consensus. *See Trimper v. Porter–Hayden, supra,* 305 Md. at 43–49, 501 A.2d at 452–56. Nevertheless, the General Assembly limited the first medical malpractice statute of repose to injuries occurring on or after July 1, 1975. Chapter 545, § 2 of the Acts of 1975. The absence of a retroactive feature is not due to constitutional prohibitions. Due process does not prohibit enacting a time bar for pre-existing undiscovered medical malpractice claims so long as a reasonable period following the effective date of the legislation is provided within which to assert pre-existing claims. *See Allen v. Dovell,* 193 Md. 359, 66 A.2d 795 (1949). With respect to limitations on medical malpractice claims stemming from injuries occurring prior to July 1, 1975, and initially asserted as survival actions in reliance on

---

7. Our interpretation of CJ § 5–109 is limited to its operation as to survival claims. We express no opinion as to whether § 5–109 applies to wrongful death claims. Assuming that it does, we express no opinion on whether "injury" as used in § 5–109 has the same meaning as "injuries" and as "medical injuries" in the effective date provisions of Ch. 545 of the Acts of 1975 and of Ch. 235 of the Acts of 1976 or whether a wrongful death claim plaintiff suffers a separate injury within the meaning of § 5–109 at the time of the patient's death. *Cf. Stewart v. United Elec. Light & Power Co.,* 104 Md. 332, 65 A. 49 (1906) and *Binnix v. Johns–Manville Prods. Corp.,* 593 F.Supp. 1180 (D.Md. 1984).

We note that the uncomplicated comparison to three years after death under the wrongful death statute which we were able to make in *Trimper* is not an available policy factor here.

the discovery rule, the General Assembly either has no policy or has a policy that discovery is the only bar to injuries incurred in that window of time.

Further, unlike the relationship of employer and nonmanagerial employee in the industrial setting involved in the occupational, latent disease claim presented in *Trimper*, the relation of physician and patient is a confidential relationship. *See Sard v. Hardy,* 34 Md.App. 217, 367 A.2d 525 (1976), *rev'd on other grounds,* 281 Md. 432, 379 A.2d 1014 (1977).

For these reasons we conclude that *Trimper* does not control and that under CJ § 5–101 a medical malpractice survival claim predicated on an injury occurring prior to July 1, 1975, accrues upon discovery.

## IV

### A

In this part IV we consider the wrongful death claim. The threshold issue is whether CJ § 5–203 applies at all to a wrongful death claim. It is an issue of first impression in this state. *Trimper v. Porter–Hayden, supra,* held that the plain language of CJ § 3–904(g), providing that a wrongful death claim "shall be filed within three years after the death of the injured person," precluded applying a judicially created discovery rule. The rule which the plaintiffs seek to have applied here, however, is the legislatively created discovery rule of CJ § 5–203. On the other hand the defendants argue that the language of § 5–203, *i.e.,* "the cause of action shall be deemed to accrue at the time when the party discovered ... the fraud," applies only to a limitations provision which is expressed by using some form of the words, "accrue" or "accrual." Under the defendants' analysis CJ § 5–203 could not apply to the time limitation, "three years after ... death," in the wrongful death statute.

Maryland's first wrongful death statute was enacted by Ch. 299 of the Acts of 1852. Present CJ § 5–203 was first

enacted by Ch. 357 of the Acts of 1868. It was expressly applicable, prospectively, to "all actions" and thus literally embraced the then relatively new actions for wrongful death.[8] Although the present statute no longer expressly refers to "all actions," it does not expressly exclude any action. The words, "all actions," were deleted by Ch. 2 of the Acts of the First Special Session of 1973 in the enactment of the CJ Article in the code revision process. In that process changes of language are presumed to be for clarity rather than to change meaning. " ' "Thus, even a change in the phraseology of a statute by a codification will not ordinarily modify the law unless the change is so material that the intention of the General Assembly to modify the law appears unmistakably from the language of the Code." ' " *Rohrbaugh v. Estate of Stern*, 305 Md. 443, 449, 505 A.2d 113, 116 (1986) (quoting *Consumer Protection v. Consumer Publishing Co.*, 304 Md. 731, 768, 501 A.2d 48, 67 (1985) (quoting *In re Special Investigation No. 236*, 295 Md. 573, 576–77, 458 A.2d 75, 76 (1983)).

Further, although the time period specified in the wrongful death statute is not an ordinary statute of limitations but is part of the substantive right of action, see *Trimper v. Porter–Hayden, supra*, 305 Md. at 35, 501 A.2d at 449, a wrongful death claim may be considered to accrue at death under CJ § 3–904(g). It is not inconsistent with the text of either § 3–904(g) or § 5–203 to "deem" a fraudulently concealed wrongful death claim to accrue on discovery rather than on death.

The reasoning of *Chandlee v. Shockley*, 219 Md. 493, 150 A.2d 438 (1959) is also persuasive here. In that case assurances had been given by an administratrix of a dece-

---

**8.** Section 1 of Ch. 357 of the Acts of 1868 read:

*Be it enacted by the General Assembly of Maryland,* That in all actions to be hereafter brought, where a party has a cause of action of which he has been kept in ignorance by the fraud of the adverse party, the right to bring suit shall be deemed to have first accrued at the time at which such fraud shall or with usual and ordinary diligence might have been known or discovered.

dent's estate that the plaintiff's claim would be settled and damages paid without the necessity of suit. Because of the assurances, suit was not commenced within the statutorily required six calendar months after the qualification of the administratrix. That time proviso was part of the right to sue and not merely a limitation of the remedy. Judge Hammond, writing for this Court, quoted extensively from *Scarborough v. Atlantic Coast Line R. Co,* 178 F.2d 253 (4th Cir.1949), *cert. denied,* 339 U.S. 919, 70 S.Ct. 621, 94 L.Ed. 1343 (1950), which concerned a claim under the Federal Employers' Liability Act. That statute's time of suit provision is also substantive. In part, the quotation from *Scarborough* reads:

" * * * We cannot see a distinction and a difference, so clear and so real, between the two classes of statutes of limitations—the remedial and the substantive—as to justify the courts in fully giving effect to fraud in tolling the statute in one type (remedial) and then flatly denying that effect to fraud in the other type (substantive). The ancient maxim that no one should profit by his own conscious wrong is too deeply imbedded in the framework of our law to be set aside by a legalistic distinction between the closely related types of statutes of limitations." [219 Md. at 500, 150 A.2d at 442.]

*Chandlee* found the reasoning of *Scarborough* sound and persuasive and applied it to reverse a judgment which had been entered on demurrer for the administratrix.

The history of § 5–203 convinces us that the reasoning of *Chandlee* and *Scarborough* is equally applicable to the time limitation in Maryland's wrongful death statute. The history of statutes such as § 5–203 is traced in Dawson, *Undiscovered Fraud and Statutes of Limitation,* 31 Mich.L.Rev. 591 (1933) (Dawson I) and *see* Dawson, *Fraudulent Concealment and Statutes of Limitation,* 31 Mich.L.Rev. 875 (1933) (Dawson II). The principal English statute of limitations which became the foundation of nearly all of the American colonial statutes of limitations was 21 James I, Ch. 16 (1623). *See Wood v. Carpenter,* 101 U.S. 135, 25

L.Ed. 807 (1879). In *Booth v. Lord Warrington*, 101 Brown's Parl.Cases 445, 2 Eng.Repr. 111 (1714), the plaintiffs sued in chancery for restitution of 1,000 guineas paid nine years previously to the defendant on the latter's false representation that he had expended that sum in procuring a marriage for the plaintiff. The chancellor ruled that limitations under the statute of James were no bar and the House of Lords affirmed. In this country a replication based on fraud to a plea of limitations was recognized in *First Massachusetts Turnpike Corp. v. Field*, 3 Mass. 201 (1807) and the concept was supported by Justice Story. But in New York, where there was a separate equity court, *Troup v. Executors of Smith*, 20 Johns 33 (1822) had held that fraud could have no effect at law on the statute of limitations. *See Piper v. Jenkins*, 207 Md. 308, 315–16, 113 A.2d 919, 922–23 (1955); Dawson I at 599–601.

Against that background *Franklin v. Waters*, 8 Gill 322 (1849) was decided. It was an action of assumpsit in which one issue was whether the plaintiff's replication raising fraud to avoid the defendant's plea of limitations would be recognized. In deliberate dicta, because the issue was "one of much interest to the profession," this Court announced its conclusion

that in Maryland, where we have a separate and distinct Chancery jurisdiction, the question of fraud, as a means of preventing the effect and operation of the Statute of Limitation, must be referred to that jurisdiction, and is not matter to be relied on, by way of replication to the plea of the statute, in a Court of law. [8 Gill at 331.]

The Act of 1868 was passed as a result of *Franklin v. Waters, supra,* "for the purpose of enabling parties to set up the fraud of the defendant in a court of law as well as in a court of equity." *Wear v. Skinner*, 46 Md. 257, 266 (1877). The principle underlying the statute is that it would be "contrary to the plainest principles of justice, to permit one practising a fraud and then concealing it, to plead the statute, when, in fact, the injured party did not know, and

could not with reasonable diligence have discovered the fraud." *Id.* at 267.

Thus, § 5–203's purpose was to authorize at law a specific application of the equitable principles of estoppel. Just as an estoppel based on assurances of payment operated to toll the substantive limitations period involved in *Chandlee,* so an estoppel based on fraud or fraudulent concealment of the cause of action operates to toll the substantive limitations period in the wrongful death statute, CJ § 3–904(g).[9]

### B

We shall now consider if this summary judgment record generates a factual issue as to whether fraud by an adverse party, within the meaning of § 5–203, kept the plaintiffs in ignorance of the wrongful death claim.

Under *Wear v. Skinner, supra,* it is settled that, where the underlying cause of action is deceit, § 5–203 does not require a fraud distinct from, and independent of, the original fraud for the purpose of keeping the injured party in ignorance of the cause of action. Thus embezzlement by a fiduciary is a § 5–203 fraud. *See Citizens Nat'l Bank v. Leffler,* 228 Md. 262, 179 A.2d 686 (1962).

Fraud which satisfies the statute may also be found where there is an express, knowingly false misrepresentation, even in the absence of a confidential relation. *See New England Mutual Life Ins. Co. v. Swain,* 100 Md. 558, 60 A. 469 (1905) (agent of a life insurer obtained a second premium payment from the plaintiff by falsely representing that it was due, apparently after the agent had pocketed the premium originally paid for the same policy period); *Cumberland Glass Mfg. Co. v. DeWitt,* 120 Md. 381, 87 A. 927 (1913), *aff'd,* 237 U.S. 447, 35 S.Ct. 636, 59 L.Ed. 1042 (1915) (defendant, when confronted by the plaintiff, denied the

---

9. We intimate no opinion as to the effect of § 5–203 on the medical malpractice statute of repose, CJ § 5–109, prior to the amendment of the latter by Ch. 592 of the Acts of 1987 to provide that nothing in § 5–109 limits the application of, *inter alia,* § 5–203.

plaintiff's accusation that the defendant had induced a third party to breach that party's contract with the plaintiff).

■ On the other hand a simply negligent misrepresentation, honestly made, is not a § 5–203 fraud. *See Consolidated Public Utilities Co. v. Baile,* 152 Md. 371, 136 A. 825 (1927). There the plaintiff in 1917 first noticed water in the basement of hotel premises leased by him and he complained to the defendant water company. The defendant investigated chiefly by driving a steel rod into the ground at various points along the course of its water main. Its superintendent concluded that the main was not leaking and the plaintiff was so informed. When, in 1924, the defendant was spurred by complaints from the building's owner and excavated around the main, the defendant found that it was leaking. The plaintiff sued in 1925 at law for damages and, in replication to a plea of limitations, averred that the defendant had fraudulently kept the plaintiff in ignorance of the cause of action " 'by denying and failing to ascertain' that the water complained of came from its main." *Id.* at 375, 136 A. at 827.[10] Holding that the replication was insufficient and reversing a judgment for the plaintiff, we said:

> But the conduct thus specified may not have involved any element of fraud. It is not alleged that there was any bad faith in the defendant's denial and failure to ascertain that there was a leak in its main near the building into which the water percolated. ... Because of the defendant's denial, and failure to discover, that a leak in its main existed, the plaintiff's suspicion as to such a leak appears from the replication to have remained for a long time

10. As amended in 1965, former Md. Rule 312 a provided that "[u]nless required by special order of court, a replication to a responsive pleading may, but need not be filed." A committee note to the former rule pointed out that it had been readopted without change in 1974 to negate any inference from certain decisions cited therein that a replication was required to a plea of limitations. Present Md. Rule 2–302 abolishes replications and permits a reply to an answer only upon court order.

unverified. But unless the denial was false, or the failure to discover was deceptive, the plaintiff was not thereby fraudulently kept in ignorance of his right to bring this suit. In alleging that the defendant failed to ascertain the existence of a leak in its main, the replication excludes the theory that the denial was made with knowledge that it was false, and there is no averment that the failure to make the discovery was in consequence of any desire or purpose to suppress the truth. The charge that the defendant "fraudulently" kept the plaintiff in ignorance of his cause of action is not sufficient to give a sinister character to the normally innocent conduct by which that result is alleged to have been accomplished. [*Id.* at 375–76, 136 A. at 827 (citations omitted).]

■ *Consolidated Public Utilities Co.*, when compared to other Maryland § 5–203 cases, led the Court of Special Appeals to conclude

that the defense of limitations can only be barred by a defendant's fraud or conduct tantamount to constructive fraud. Negligence alone cannot estop a negligent party from asserting the defense of limitations. [*Johns Hopkins Hosp. v. Lehninger, supra,* 48 Md.App. at 561, 429 A.2d at 545.]

With respect to medical malpractice claims, the above-quoted propositions state the traditional view in states which by judicial doctrine or statute toll limitations because of fraud or fraudulent concealment. Writing in 1933 when most states held that a medical malpractice cause of action accrued when a breach of duty first occurred, Dawson described the extent to which fraud tolling was accepted at that time in medical malpractice cases.

Nor has the narrow circle of this strict reasoning been broken to any great degree by the use of the undiscovered "fraud" and "fraudulent concealment" exceptions. There is very little authority for the application of the "fraud" exception to negligent injuries by physicians. The "fraudulent concealment" exception may be used where there is a subsequent and intentional misrepresen-

■■■■■

tation as to the seriousness of the injury. But without knowledge by the defendant that an injury has occurred, no court has suspended the statute on the ground of "fraudulent concealment." And it is uncertain whether mere knowledge on the defendant's part creates an obligation to disclose the existence or extent of the injury. At least it is fairly clear that the loud lament of plaintiffs, describing their complete helplessness and ignorance throughout the statutory period, will awake no sympathetic response from appellate courts. [Dawson II, at 904–06 (footnotes omitted).]

Today many courts continue to hold that the fraud exception cannot be satisfied by evidence which demonstrates no more than negligence, including a failure to obtain an informed consent. In general, proof satisfying the fraud exception will require that a plaintiff demonstrate, under the circumstances of the particular case, that the physician either knew of the alleged negligence and affirmatively concealed it, or under the rule in some states, knew of the negligence and failed to disclose it. *See Jones v. Central Arkansas Radiation Therapy Inst., Inc.*, 270 Ark. 988, 607 S.W.2d 334 (1980); *Trantafello v. Medical Center of Tarzana*, 182 Cal.App.3d 315, 227 Cal.Rptr. 84 (1986); *Bowman v. McPheeters*, 77 Cal.App.2d 795, 176 P.2d 745 (1947); *Hiznay v. Strange*, 415 A.2d 489 (Del.Super.Ct.1980); *Nardone v. Reynolds*, 333 So.2d 25 (Fla.1976); *Alford v. Summerlin*, 362 So.2d 103 (Fla.Dist.Ct.App.1978); *Hendrix v. Schrecengost*, 183 Ga.App. 201, 358 S.E.2d 486 (1987); *Smith v. Cook County Hosp.*, 164 Ill.App.3d 857, 115 Ill.Dec. 811, 518 N.E.2d 336 (1987); *Schnebly v. Baker*, 217 N.W.2d 708 (Iowa 1974); *Gover v. Bridges*, 497 So.2d 1364 (La.1986); *Millett v. Dumais*, 365 A.2d 1038 (Me.1976); *Collins v. Johnson*, 374 N.W.2d 536 (Minn.Ct.App.1985); *Clair v. Reproductive Health Servs.*, 720 S.W.2d 793 (Mo.Ct.App.1986); *Rankin v. Sowinski*, 119 N.J.Super. 393, 291 A.2d 849 (1972); *Keithley v. St. Joseph's Hosp.*, 102 N.M. 565, 698 P.2d 435 (Ct.App.1984); *Simcuski v. Saeli*, 44 N.Y.2d 442, 406 N.Y.S.2d 259, 377 N.E.2d 713 (1978); *Ray v. Scheibert*,

224 Tenn. 99, 450 S.W.2d 578 (1969); *Ray v. Scheibert*, 484 S.W.2d 63 (Tenn.Ct.App.1972); *Borderlon v. Peck*, 661 S.W. 2d 907 (Tex.1983).

Indiana, on the other hand, applies a theory of constructive fraud based on an extension of the confidential relation between physician and patient under which the physician has a duty to disclose that which the physician ought to have known, although this duty to disclose the unknown which should have been known generally terminates when the relationship ends. *See, e.g., Walters v. Rinker*, 520 N.E.2d 468 (Ind.Ct.App.1988). The Indiana position has been criticized, justifiably in our opinion, as an unwarranted extension of the physician's liability. *See Kern v. St. Joseph Hosp.*, 102 N.M. 452, 697 P.2d 135 (1985). A rule under which the plaintiff need only show the negligence complained of to prove constructive fraud, because the physician has a legally imposed duty to disclose that which should have been known, would, in terms of Maryland law, place no greater burden on a plaintiff who seeks to toll limitations based on fraud than is placed on a plaintiff who seeks to avoid limitations based on the discovery rule. In either case the plaintiff need only have been diligent.

At the other end of the spectrum is the rule followed in Michigan. *See De Haan v. Winter*, 258 Mich. 293, 241 N.W. 923 (1932); *Dunmore v. Babaoff*, 149 Mich.App. 140, 386 N.W.2d 154 (1985). Under that rule affirmative fraud or misrepresentation alone satisfies the fraud exception. The physician who knows that his or her negligence has injured the patient has no duty to speak so that silence, even under those circumstances, is not constructive fraud.

The Circuit Court for Baltimore County in the case now before us applied the general rule and concluded that there was no basis on which a jury could find that Dr. Richards did not subjectively believe that the statements attributed to him by Elaine were true. The combination of (1) Elaine's testimony concerning Dr. Richards's representations as to the quality of treatment with (2) the opinions of

experts setting forth various ways in which that treatment fell below the applicable standard of care is not evidence permitting an inference of fraud within § 5–203.

Elaine would have to prove that Dr. Richards intended to harm the patient for the initial explanation of a contemplated course of treatment to be fraudulent. Thereafter, objectively false representations about the diagnosis and treatment previously administered are not fraudulent, even if there was negligence, unless Dr. Richards knew of the facts constituting the plaintiffs' cause of action. A plaintiff obviously does not establish § 5–203 fraud by showing only that there is a difference of opinion concerning the applicable standard of care.

Plaintiffs point to Dr. Richards's deposition in *Burton* as evidence directly and sufficiently creating an inference of knowingly false representations. Plaintiffs say that the trial court acted improperly in the summary judgment format by evaluating credibility and accepting Dr. Richards's opinion that understaffing and the other admitted deficiencies in his department did not affect the quality of care. Certainly, at trial, a jury could accept as true the admissions of Dr. Richards as to the liability issue and reject his explanation that the quality of life of his staff was affected, but not the quality of patient care. The present issue, however, is limitations. To the extent that a triable issue of fraud in the instant matter is dependent on misrepresentations made with knowledge of their falsity, the deposition testimony of Dr. Richards is not sufficient. Even though a jury could reject Dr. Richards's exculpatory testimony, that rejection would not constitute evidence of Dr. Richards's state of mind sufficient to support, by clear and convincing evidence, a finding that his actual belief was contrary to his testimony. Because plaintiffs at trial will have the burden of proving fraud, plaintiffs on summary judgment, even where the defendants are the movants, must demonstrate that fraud is a triable issue. *Celotex Corp. v. Catrett,* 477

U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).[11]

Plaintiffs further submit that the fraud element of § 5–203 is satisfied by representations which are in fact untrue and which are made with a reckless disregard for their truth or falsity. The clearest illustration is *Brack v. Evans*, 230 Md. 548, 187 A.2d 880 (1963), a negligence action by a customer against a stockbroker. The plaintiff had read that stock of the Upjohn Company was to be split twenty-five to one and that a portion of the new stock would be sold to the public at $45 per share on December 10, 1958. On November 24, 1958, the customer telephoned the broker and tendered an order for $15,000 of the new stock at the $45 per share price. The broker told the buyer that the new stock would probably be oversubscribed and that the customer should buy ten shares of the old stock then selling at $1,525 per share. The customer placed the recommended order. Only then did the customer compute that he was, in terms of the new stock, buying at $61 per share so that he would be receiving eighty-nine fewer shares or a difference in value of approximately $4,000. When the customer immediately attempted to cancel the order, he was told by the broker that the order had been executed but that it would not make any difference because the customer would receive from the corporation "dividends, rights and privileges" which would equal the eighty share differential. The plaintiff's stock certificates arrived on January 3, 1959, in the form of 250 shares of the new stock. He received no special or additional "dividends, rights and privileges" for having bought the old stock.

The customer's suit would have been barred by limitations if the action accrued on November 24, 1958, but it was timely if fraud tolled limitations until January 3, 1959. The issue on appeal was the sufficiency of the pleadings and we held that there was a sufficient averment of fraudulent

---

11. This rule assumes that the plaintiff opposing summary judgment has had a reasonable opportunity to utilize discovery. In the present case, plaintiffs do not contend that they were denied discovery rights.

concealment. In so doing we said that the heart of the plaintiff's allegations was that the broker's

> *recklessly false representations* that dividends, rights and privileges incident to the old stock would offset the difference in price of the new stock, operated to conceal their falsity and amounted in themselves to fraud by which he was kept in ignorance of the existence of his cause of action. [*Id.* at 555, 187 A.2d at 884 (emphasis added).]

The *Brack* opinion does not fully explicate its conclusion but certain factors are implicit. Whatever dividends, rights and privileges holders of the old stock were to receive on its conversion into the new stock were objectively determinable facts at the time of the conversation between the broker and customer. The case does not involve a dispute over the value of dividends, rights and privileges or over whether they were fully offsetting. There simply were no dividends, rights and privileges afforded persons who had held the old stock in relation to those who directly purchased the new and that information was an objectively discernible fact. Consequently, there was no basis for the broker's statement and, even if the broker subjectively believed the statement to be true, it was recklessly false. This reading of *Brack v. Evans* gives to the concept of fraud in § 5–203 the same scope as the element of falsity for the tort of deceit. *See Appel v. Hupfield*, 198 Md. 374, 378, 84 A.2d 94, 95–96 (1951) ("In order to entitle the plaintiff to recover in an action for deceit it must be shown ... that either its falsity was known to the defendant or the misrepresentation was made with such reckless indifference to truth as to impute knowledge to [the speaker]....").

In the case before us the reports of the plaintiffs' experts which came into the summary judgment record without objection generate a factual issue of reckless indifference. The fact question is whether Dr. Richards had a basis for representing that the particular cancer in Geisz had been treated, but for some inexplicable reason had withstood treatment.

In his *Burton* deposition, Dr. Richards acknowledged the importance of portal films as the means to verify that radiation treatments are in fact reaching the intended treatment area. But Dr. Moody D. Wharam, of Baltimore, one of the plaintiffs' experts, after reviewing radiation therapy and other medical records pertaining to Geisz reported that "there appears to have been no treatment planning session or films *nor were any portal verification films obtained.*" [Emphasis added.] Dr. Allen S. Lichter, Associate Professor and Chairman of the Department of Radiation Therapy at the University of Michigan Medical School, reported:

> The radiation fields that Dr. Richards utilized were most unconventional. They did not cover all the lymph nodes in the regions that were being treated, *no simulator or port films were taken* to confirm adequate coverage of this patient's tumor. No calculation sheet appears in the chart to document how timer settings were arrived at. No record in the chart exists for the daily timer setting from the machine to be recorded and *thus it is impossible to know that the patient actually received the desired treatment each day.* No tumor dose is carried to show what the actual mass of Hodgkin's disease was receiving in terms of dose. In general, this radiation was delivered far below minimum standards and in a very haphazard fashion. [Emphasis added.]

Dr. Stanley E. Order, Professor of Radiation Oncology and Director of Radiation Oncology at the Oncology Center of the Johns Hopkins Hospital, after reviewing the records of thirteen patients, including Geisz, treated by Dr. Richards, reported that he had "never examined such wanton and irresponsible application of radiation therapy."

Dr. Richards did not personally administer the treatments in Geisz's courses of radiation therapy. It was done by technicians on his staff under his direction and supervision. One inference is that the sole basis for his assertions as to the care rendered was these same records.

It appears that the plaintiffs will be able to present evidence at trial that it was impossible for Dr. Richards to

determine whether the desired treatment had actually been received. If believed, that evidence could support a finding of reckless indifference to the truth under *Brack v. Evans, supra.*

Our conclusion in part III A that a jury could find that the plaintiffs acted with diligence in view of the representations said to have been made by Dr. Richards, coupled with the permissible finding that the representations were recklessly false, results in the possibility of tolling under § 5–203 and defeats summary judgment on the wrongful death claim.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AND TO REMAND TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY, AND DIVIDED EQUALLY AMONG, THE RESPONDENTS.