NEGRO ANDREW FRANKLIN *vs.* FREEBORN G. WATERS, EXC'R OF CHARLES WATERS.—*December*, 1849.

A negro slave was manumitted, by deed, on the 1st of January, 1840, but was held in servitude, by his master, until the 12th of May, 1846. HELD: that he could not maintain an action against his master, to recover the value of his services for the time he was so held to service.

The case of *Queen vs. Ashton*, 3 *H. & McH.*, 439, explained and approved.

In this State, where we have a separate chancery jurisdiction, the question of fraud, as a means of preventing the effect and operation of the statute of limitations, must be referred to chancery, and cannot be relied on, by way of replication to the plea of the statute, in a court of law,

Appeal from *Baltimore* county court,

This was an action of *assumpsit*, instituted, on the 2nd of September, 1846, by the appellant, a negro, against the appellee, to recover the value of his services during the time he was held in service by the appellee's testator, from the 1st of January, 1845, until 1st of May, 1846.

The declaration contains the general *indebitatus assumpsit* and money counts, also a count upon an account stated. The defendant pleaded, 1st, *non assumpsit*, 2nd, *non assumpsit infra tres annos*, and 3rd, *actio non accrevit infra tres annos*.

The plaintiff took issue upon the first plea, and traversed so much of the *second* as relates to the sum of $400, due for the services of the plaintiff, performed within three years next before the commencement of the suit, and as to the residue of said plea, by way of replication, alleged, "that for a long period of time before the institution of this suit, until within three years thereof, the plaintiff was illegally imprisoned and held in duress by the defendant's testator, and was never, until within three years before the commencement of this suit, at large and free from such duress and imprisonment, and this he is ready to verify," &c.

The plaintiff also traversed so much of the *third* plea as related to the value of his services within three years next before institution of the suit, and as to the residue, by way of replication, alleged, "that the plaintiff was, on the 9th of June,

1812, a slave for life to said *Charles Waters*, who then executed a deed of manumission, which was recorded according to law, and which released the plaintiff from slavery from and after the 1st of January, 1840, by force of which the plaintiff became entitled to his freedom from and after said last mentioned day; yet the said *Waters*, contriving and intending to deceive and defraud the plaintiff of the value of his services, fraudulently concealed from him the execution of said deed, and fraudulently pretended that the plaintiff was his slave for life, and actually continued to hold the plaintiff as his slave, from and after said 1st of January, 1840, until the 12th of May, 1846. By reason of which said fraudulent contrivance, concealment, actings and doings of the said *Waters*, the said plaintiff was kept in ignorance of his said several causes of action from the time they accrued, until within three years next before the commencement of this suit, and this he is ready to verify," &c.

The defendant rejoined, and took issue upon the traverses tendered in the replication, and traversed the residue thereof, and, upon the traverses tendered by the rejoinder the plaintiff took issue.

At the trial, the plaintiff offered in evidence a deed of manumission executed by the defendant's testator, on the 9th of June, 1812, by which, said testator "manumitted and set free my negro boy, *Andrew*, from and after the 1st day of January, 1840," and then offered evidence, by competent witnesses, tending to prove that he was the same person named in said deed of manumission, the value of his services, and that he was detained in slavery by said testator up to the time of the latter's death, on the 12th of May, 1846, and was kept in ignorance of said deed of manumission, and of his right to freedom, until he was discharged by the defendant, as executor as aforesaid, on the 2nd of September, 1846.

The defendant, then, in order to show that the plaintiff was not the person named *Andrew* in the deed of manumission, offered in evidence the will of his testator, executed on the 2nd of April, 1846, in which the testator bequeaths a legacy of

$100 to his "negro man *Andrew*," and a receipt to defendant, as executor, for this legacy, executed by the plaintiff on the 11th of December, 1846.

The plaintiff then prayed the court to direct the jury:

1st. That if they find that the plaintiff is the person named *Andrew* in the deed of manumission of the 9th June, 1812, and that he was retained in the service of defendant's testator in the manner stated in his evidence, then the plaintiff is entitled to recover so much as the jury may find, from the evidence, his services were worth from the period for which they may find he was so retained by the testator, after the 1st day of January, 1840.

2nd. That if they further find, that the testator fraudulently concealed from the plaintiff the execution of said deed, and that plaintiff was ignorant thereof, and remained with the testator, under the impression that he was the slave of the testator, who claimed him as such until his death, then the plaintiff is entitled to recover, as in 1st prayer.

The defendant then offered this prayer:

That if the jury find, from the evidence, that the plaintiff was claimed by the defendant's testator, in his lifetime, as a slave, and held and used by him as a slave, in his lifetime, and down to the period of his death, the plaintiff will not be entitled to recover in this action, for his services rendered to the said defendant's testator, whilst he was so held in servitude, as a slave.

The court (LE GRAND, J.,) rejected the prayers of the plaintiff, and granted that of the defendant; to the granting of which, and the refusal to grant his own, the plaintiff excepted, and the verdict and judgment being against him, appealed to this court.

The cause was argued before DORSEY, C. J., CHAMBERS, SPENCE, MARTIN, and FRICK, J.

MAY and DULANEY, for the appellant, insisted:

That the suit could be maintained, and in support of this

proposition, cited the following authorities: 2 *Greenleaf on Ev.*, *sec.* 120. 11 *Mass.*, 34. 3 *John.*, 201. 15 *Pick.*, 129, *Guild vs. Guild.* 6 *G. & J.*, 58. 11 *G. & J.*, 256. 3 *Gill*, 239, *McKee vs. Baden.* 1 *Har. & John.*, 344, *Jennings vs. Higgins.* 3 *M. & Sel.*, 191, *Foster vs. Stewart.* 12 *John.*, 188, *Cook vs. Husted.* 3 *Yeates*, 250, *Negro Peter vs. Steel.* 2 *Gilman*, 1, *Jarrott vs. Jarrott.* 2 *Scammon*, 232, *Kinney vs. Cook.* I *Bibb*, 224, *Thompson vs. Wilmot.*

They also insisted, on the 2nd point, that the appellant was imprisoned, or under duress, and that this constituted a good defence to the plea of limitations. *Act of* 1715, *ch.* 23, *sec.* 3. 3 *Black. Com.*, 127. 4 *Yerger*, 299, *Matilda vs. Crenshaw.* *Coke Litt.*, *sec.* 419.

Fraud is a good replication to the plea of limitations. 4 *Bac. Ab.*, 476. 8 *Cranch*, 84, *Richards vs. Md. Ins. Co.* 2 *Doug*, 655, *Bree vs. Holbech.* 5 *Barn. & Cres.*, 149, *Granger vs. George.* 3 *Bligh.*, 2, *Whalley vs. Whalley.* *Angel on Lim.*, 188. 2 *Greenleaf on Ev.*, *sec.* 448. 3 *Greenleaf's Rep.*, 405, *Bishop vs. Little.* 3 *Mass.*, 201, *Mass. Turnpike vs. Field.* 4 *Mason*, 143, *Sherwood vs. Sutton.* 9 *Pick.*, 212, *Farnham vs. Brooks.* 6 *Pick.*, 276. 4 *Yeates*, 109, *Jones vs. Conoway.* 1 *Watts*, 110, *Rush vs. Barr.* 8 *Watts*, 12, *Harrisburg Bank vs. Forster.* 2 *Haywood*, 129, *Sweat vs. Arrington.* 2 *McCord*, 426, *Harrell vs. Kelly.* *Hardin*, 258, *Singleton vs. Lewis.* 4 *Bibb*, 318, *Duvall vs. Stafford.* 1 *Dana*, 373, *Frankfort Bank vs. Markley.* 1 *McLean*, 96, *Mitchell vs. Thompson.* 3 *Vermont*, 212. 1 *Edwards*, 343.

POE and ALEXANDER, for the appellee, argued:

That the action could not be maintained, and cited: *Co. Litt.*, 308, 816, 282, *b*, 379, *a b.* 1 *M. & Sel.*, 394. 8 *Bing*, 542. 3 *Esp.*, 3, *Alfred vs. Marquis of Fitzjames.* 3 *How.*, 248. 3 *Bl. Com.*, 162. 2 *G. & J.*, 343. *Stockett vs. Watkins.* 3 *Taunt.*, 274. 1 *Taunt.*, 112. 3 *M. & Sel.*, 119. 3 *H. & McH.*, 538, *Queen vs. Ashton.* 1 *H. & J.*, 344. 9 *Car. & Pay.*, 87, *Davis vs. Davis.* 2 *Greenleaf on Ev.*, *sec.* 108. 1 *H. & G.*, 153. 2 *H. & G.*, 103. 1 *Saund.*, 264.

*Cowp.*, 371.  12 *John.*, 188.  11 *G. & J.*, 367, *Abell vs. Harris.*  5 *Wend.*, 531.  3 *Penn.* 212.

The cases whether fraud can be replied, to avoid the statute of limitations, decided in this country, may be divided into two classes.  1st. Where there is no court of chancery, it may be replied at law.  2nd. Where there is a court of chancery, it cannot be so replied.  In *New York, South Carolina, North Carolina* and *Virginia,* there are separate courts of equity, and the plea is not received.  *Louisiana, Maine, New Hampshire,* and *Pennsylvania,* receive the plea.  *Kentucky* and *Indiana* are exceptions to the rule.

*Angel on Lim.*, 189.  2 *Doug.*, 654.  2 *Story's Eq.*, sec. 1521.  1 *Brown's C. C.*, 445.  3 *Peere Wms.*, 143.  2 *Sch. & Lef.*, 634.  5 *John. Ch. Rep.*, 522.  20 *John.*, 48, 271, 277.  17 *Wend.*, 204.  1 *Hill S. C.*, 296.  3 *Murphy*, 115.  4 *Leigh*, 479.  3 *G. & J.*, 160, 390.

CHAMBERS, J., delivered the opinion of this court.

The counsel for the appellant, aware of the unfavorable impression which has been generally entertained by the profession in *Maryland,* in regard to the right of recovery in such a case as this, have combatted its propriety with a zeal and ability which nothing but truth could resist.

It is a mistake, however, to suppose this professional opinion the result only of some vague conception, formed without foundation.

The early case of *Queen and Ashton,* 3 *H. & McH.*, 439, has doubtless been the origin of such an opinion.

That case was argued by distinguished counsel in the late general court, where the most intelligent members of the bar from all the counties were assembled, and the principles on which it was argued and adjudged, were, in all probability, well known at that time in every part of the State.  How else is it to be accounted for, that such actions have been unknown from that period, although it is scarcely possible to doubt that occasions for it have frequently occurred?

We have inspected the record in that case, because there is

some obscurity in the report of it, and we have no doubt the general court decided that the action would not lie. The claimant had been turned out of court by the judgment below, from which he appealed. That judgment was the result of a refusal to declare the law as he claimed it. If the general court supposed the law of the case was with the plaintiff, it was an obvious duty to send the case back on a *procedendo,* with directions to the court below to instruct the jury accordingly, which instruction, according to the facts of the case, must have entitled the plaintiff to a verdict and judgment; but, on the contrary, they affirmed the judgment, thereby deciding that the plaintiff was not entitled to the verdict and judgment, and was properly turned out of court. The obscurity of the case arises from the expression of the reporters, "affirmed on both exceptions." an error into which they appear to have been led by looking to the docket, an entry on which seems to have been made erroneously at first, then altered, but not correctly altered at last.

The second exception could not in fact have been before the general court. The act of October, 1778, ch. 21, sec. 14, authorises persons affected by an equal division of the court, to have a bill of exceptions; and in 4 *H. & J.,* 177, *Smith and Gilmor,* this court held, either or both parties might except under that act, but there is nothing in that act to justify a party to complain in the appellate court of an instruction to which he did not except at the trial, nor to prosecute an appeal on an exception taken by the adverse party, who declines pursuing the appeal himself. In the case of *Queen and Ashton,* the plaintiff did not except to the instruction stated to have been given in the second exception, and the defendant, by whom the exception was taken, did not prosecute an appeal, so that the general court was not called to act at all on that exception.

We cannot agree with the appellant's counsel, that the case of *Queen and Ashton,* introduces any new principle. The relations that exist between master and slave, must necessarily modify those general rules which govern the rights of persons. This was fully declared and acted upon in the case of *Alfred*

*vs. Marquis of Fitzjames,* 3 *Esp.,* 3, decided by *Lord Kenyon* fifty years ago. The plaintiff in that action, which was *assumpsit* for work and labor, was a slave, in *Martinique,* to the defendant's wife before her intermarriage, and came with her to *England,* where he continued to reside with her, and after her marriage, with the marquis; yet the court held, and the reporter says, with emphasis: "*Lord Kenyon* was prepared to give a *decided* opinion, the plaintiff was not entitled to recover, unless it could be proved that the marquis had *expressly promised* to pay wages, and then only from that time. And the ground of this decision was, that there was no original contract for wages, which must mean a contract, express or to be implied." *Lord Kenyon* cannot be supposed to deny, that in a proper state of facts, a jury not only may, but is bound to infer a contract, a position universally admitted, and to prove which, it is only necessary to refer to the numerous cases cited at bar. But it is an equally sound principle, that no such *assumpsit* or contract to pay can be implied, where the facts show that the parties did not intend or design the one to pay or the other to receive. Where, from the fact that both parties understood, no compensation was to be made, or, from any other circumstances, it would be utterly inconsistent with the transaction, the law will not imply a contract to pay. 2 *G. & J.,* 341, *Stockett and Watkins,* and cases there cited.

In 5*th Wend.,* 531, the action for work and labor was brought, as here, by a negro man against the person who had held him as a slave, he being in fact free, yet, on the authority of the case of *Alfred and Marquis Fitzjames,* it was held, the understanding of the parties during the service being that no wages were to be paid, the plaintiff could not recover. We have found no case in which, under such circumstances, an action of *assumpsit* has been sustained, in *England* or in any State in this Union, except the one in *Pennsylvania* and those cited from *Illinois.*

In 3 *Yeates,* 250, *Negro Peter vs. Steel,* decided in *Pennsylvania,* in 1801, by *Yeates* and *Brackenridge,* justices of the Supreme Court, such an action was sustained. To that

authority we cannot defer, for several reasons, and, amongst them, because, first, the then chief justice and his immediate predecessor, had each expressed a different opinion in that very case; next, because the later case, in 3 *Pennsylvania Reports,* 212, *Urie and Johnson,* seems virtually to overrule it, and again, because the case of 3 *Esp.,* directly in point, was not before the court or cited in the argument, but, especially, because it was ruled on the ground, that it was a proper form of action in which to try the question of freedom.

In *Kinney and Cook,* 3 *Scammon,* 232, such an action was sustained in *Illinois.* The principal question seems to have been, whether the negro was free because he was a negro? Not a particle of evidence was given to show the plaintiff to be free, nor was a single authority referred to in the cause by the counsel or the court, as far as the report shows; and the learned justice who gave the opinion very civilly decides, that the rule which, in the slave states, imposes the *onus probandi* on the party asserting his freedom, is founded in "injustice," is "subversive of natural right, its arbitrary character is repugnant to moral sense," &c., &c. Notwithstanding these most potent recitals, we must decline allowing *Justice Smith's* repealing act to operate extra-territorially, as far as relates to *Maryland,* where we will, *non obstante,* abide by the old fashioned practice of requiring a party asserting a fact to prove it, when an issue is taken upon it by the adverse party. The other case referred to in *Illinois,* and found in 2 *Gillman,* 1, the case of *Jarrot vs. Jarrot,* was argued and decided, not only with very much better temper, but with very much greater ability and legal learning. The great question in the cause was, whether the plaintiff was free or a slave? There does not appear to have been any question made as to the form of action for which the authority of the previous case was relied on by counsel, and it was doubtless on the question of freedom *vel non* that the court divided.

But besides that, this question was not seriously discussed, it must be remembered, that the reason on which these cases rest is conclusive against their authority in *Maryland.* That

reason is, that it is a proper form in which to try the title of the negro to freedom. Now, in our State, the mode in which this question is to be tried, is not only prescribed by statute, but there are peculiarities in regard to it, which cannot be gratified but by an observance of the mode indicated. It must be by petition in a court particularly designated, and the right of peremptory challenge is expressly secured to both master and slave. To deny to either party the privilege secured by the statute, if the trial be by petition, would be an admitted violation of the plain meaning and express words of the law. Is it less so to permit one of the parties to deprive the other of this privilege, by using a different form of action?

So in some of the slave States, where no special provision exists as to the mode of trying the question of freedom, they use the action of trespass *vi et armis* for that purpose, as is proved by the cases cited by counsel, and in some of which it is said, the freedom should be thus established before they can claim compensation, although that compensation was said to be recoverable afterwards in the same form of action.

The counsel attempted a distinction between cases in which there was ground for reasonable doubt, and where no doubt could exist. In the case of *Alfred and Marquis Fitzjames*, no such distinction was relied on, and certainly there could be as little ground to doubt in that case, where no one *could* be a slave, as in this case, (where the manumission does speak of some conditions,) or indeed in any case which can occur in our State. But the impossibility of practically following out any such rule must be obvious.

Who is to judge whether the case be clear or one of doubt? When is it to be ascertained, and how? Is the form of action only to be ascertained by the result of the trial? The parties will certainly differ. It is of frequent occurrence that juries are unable to agree upon questions of fact, and judges are not always unanimous in regard to questions of law. The only persons at all likely to be held and claimed as slaves in this State, are such as have been manumitted by last will and tes-

tament, or a deed recorded, and whose freedom is to commence at some date subsequent to the execution of the will or deed.

But as all such instruments are exposed on the public records, to which all persons have ready access, and of which any one is able to procure copies, there is very small probability in this age of benevolence and charity, that there will be wanting persons to remind them of their rights, should they be otherwise uninformed. Experience has fully demonstrated, that they have never failed in the recovery of their legal rights, for the want of generous professional aid. We do not therefore admit the necessity, if, on other accounts, we could perceive the propriety or claim the authority of changing the recognised principles of common law applicable to this question, especially as our statute law enforces the necessity of adhering to it.

This decision on the principal question would conclude the whole case, and, especially, so much as relates to the fact of imprisonment, alleged to be implied by holding and claiming the appellant as a slave.

The remaining question in the cause, though practically unimportant in this case, after the view we have taken, is, however, presented by the record, and has been most elaborately argued by all the counsel, and is one of much interest to the profession.

A most careful and deliberate consideration has therefore been given to the numerous authorities referred to, and without here entering into a detail of reasoning, or a minute examination of their respective claims to deference, it is sufficient to announce the conclusion to which we have been conducted, with the same unanimity with which we have acted on the first point. That conclusion is, that in *Maryland*, where we have a separate and distinct chancery jurisdiction, the question of fraud, as a means of preventing the effect and operation of the statute of limitation, must be referred to that jurisdiction, and is not matter to be relied on, by way of replication to the plea of the statute, in a court of law.

JUDGMENT AFFIRMED.