550 A.2d 1155

**PENNWALT CORPORATION**

v.

**Evangelia NASIOS et al.**

**Misc. No. 20, Sept. Term, 1986.**

Court of Appeals of Maryland.

Dec. 21, 1988.

434

James K. Archibald, Jeffrey A. Dunn, Maryruth Vollstedt and Venable, Baetjer & Howard, Baltimore, and Larry R. O'Neal, Shook, Hardy & Bacon, Kansas City, Mo., all on the brief, for appellant.

Victor E. Schwartz, Liberty Mahshigian, Kathryn Kelly and Crowell & Moring, Bruce J. Brennan, Geoffrey R.W. Smith, on the brief, Washington, D.C., amicus curiae for Pharmaceutical Manufacturers Ass'n.

Eugene J. Yannon, Bowie, Edward P. Camus, Riverdale, both on the brief, for appellees.

Michael A. Pretl, H. Robert Erwin, Jr. and Pretl & Erwin, P.A., on the brief, Baltimore, amicus curiae, for Maryland Trial Lawyers Ass'n, Inc.

Argued before ELDRIDGE, COLE, RODOWSKY, COUCH *, McAULIFFE, and ADKINS, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals of Maryland (retired) Specially Assigned.

---

* Couch, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion:

COLE, Judge.

In this case we are asked to determine when an action accrues in a medical products liability case. Pursuant to the Uniform Certification of Questions of Law Act, Maryland Code (1984), §§ 12–601 to 12–609 of the Courts and Judicial Proceedings Article, the United States District Court for the District of Maryland certified the following question of state law for our consideration.

Whether under the discovery rule, knowledge of the manufacturer's wrongdoing or of product defect is required, in addition to knowledge of possible causation, to trigger the statute of limitations in a medical products liability action.

We set forth the following facts to place the question presented in proper focus. On June 17, 1980, Evangelia Nasios was admitted to Holy Cross Hospital to deliver her second child. Prior to delivery, Nasios received an epidural injection of the anesthetic Nesacaine, a drug supplied by Pennwalt Corporation (Pennwalt). Within hours after childbirth it became apparent that Nasios was partially paralyzed. In an effort to remedy the paralysis, her doctors performed an emergency laminectomy the following day to correct an epidural hematoma.[1] However, the surgery did not improve Nasios's condition. Five days later, a doctor at the hospital explained to Nasios that her prognosis was not bright and that the epidural anesthesia may have been the cause of her paralysis.[2] Nasios hired an attorney shortly thereafter and began investigating her possible claims. On July 17, 1985, over five years after her injury, and after

---

1. One expert, T. Crawford McAslan, concluded that Mrs. Nasios's paralysis resulted from nerve damage caused by the epidural hematoma.

2. Dr. Chong Lee, an anesthesiologist, made the following entry in Nasios's progress notes on June 22, 1980:

   Several cases [sic] report[s] reported in Anthesia and Analgesia (Vol. 59, No. 6, June 1980) Journal similar to Mrs. Nasios's case was [sic] found and explained to patient who seems to be aware of not bright prognosis.

changing attorneys several times, Nasios filed a breach of warranty, negligence, and strict liability suit against Pennwalt. Pennwalt asserted that Nasios's claim was barred by limitations and moved for summary judgment.

Judge Ramsay, sitting for the United States District Court for the District of Maryland, summed up the crucial facts and his conclusions in the Certification Order. Judge Ramsay made clear that Nasios knew that Nesacaine was a possible cause of her paralysis more than three years before filing suit. Additionally, Nasios thoroughly investigated a possible claim against Pennwalt. Nevertheless, Judge Ramsay indicated that he could not conclude as a matter of law that Nasios had knowledge of the alleged manufacturer wrongdoing or product defect more than three years before filing suit. From the foregoing, Judge Ramsay concluded that if knowledge of possible causation is all that is required to trigger the running of the statute of limitations, then summary judgment should be granted in favor of the defendants. On the other hand, if the plaintiff must have knowledge of manufacturer wrongdoing or product defect before the statute of limitations begins to run, he suggested that summary judgment would be inappropriate. Judge Ramsay found that there was insufficient Maryland law on this point and therefore certified to us the question of whether knowledge of a manufacturer's wrongdoing or product defect is necessary to begin the running of the limitations period.

Pennwalt would have us answer the certified question with an unequivocal "no." It argues that a cause of action accrues when a potential plaintiff discovers his injury and there is no requirement that he need know of any manufacturer wrongdoing or product defect. Nasios would have us answer the certified question with a qualified "no." Nasios argues that the statute of limitations does not begin to run on a potential plaintiff until the injury, possible cause of the injury, and knowledge of probable wrongdoing are discovered or should have been discovered through reasonably diligent investigation. Nasios qualifies her "no" answer to

the certified question because, in Nasios's view, the question requires express knowledge of wrongdoing, and Nasios recommends a standard of express or implied knowledge which contemplates knowledge of what a reasonably diligent investigation would have revealed.

The statute we must construe, Maryland Code (1984), § 5–101 of the Courts and Judicial Proceedings Article, is rather straightforward: "A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced." The meaning of the key term "accrues," however, has not been legislatively defined, leaving the task of determining when an action accrues to the judiciary. *Pierce v. Johns–Manville Sales Corp.*, 296 Md. 656, 664, 464 A.2d 1020, 1025 (1983). Before answering the question we face today we will review the purpose of statutes of limitations and our development of the area of the law.

## I

Statutes of limitations have existed in Maryland and in other common law jurisdictions for hundreds of years. *See* Ferguson, *The Statutes of Limitation Saving Statutes,* 12–14 (1978). The statutes were enacted in an effort to balance the competing interests of potential plaintiffs, potential defendants, and the public. The statutory period provided by a statute of limitations represents a compromise of these interests and "reflects a policy decision regarding what constitutes an adequate period of time for a person of ordinary diligence to pursue his claim." *Goldstein v. Potomac Electric Power Co.*, 285 Md. 673, 684, 404 A.2d 1064, 1069 (1979). By creating a limitations period, the legislature determined that a plaintiff should have only so long to bring his action before he is deemed to have waived his right to sue and to have acquiesced in the defendant's wrongdoing. Limitations statutes therefore are designed to (1) provide adequate time for diligent plaintiffs to file suit, (2) grant repose to defendants when

plaintiffs have tarried for an unreasonable period of time, and (3) serve society by promoting judicial economy. *Pierce,* 296 Md. at 665, 464 A.2d at 1026.

Historically, the general rule in Maryland was that an action accrued on the date of the wrong. *Hahn v. Claybrook,* 130 Md. 179, 182, 100 A. 83 (1917). Under this rule it was irrelevant when the plaintiff discovered or should have discovered that the defendant had wronged him. The date of the wrong rule operated adequately in most tort actions because the plaintiff was aware of his injury and the defendant's wrongdoing almost immediately. Under those normal circumstances, the plaintiff had the full statutory period to pursue his claim.

We later recognized that the date of the wrong rule did not provide equitable results in all cases. Consequently, we created the "discovery rule" as an exception to the general rule. Although we first intimated our adoption of the discovery rule in *Hahn,* a medical malpractice case, it was not until *Waldman v. Rohrbaugh,* 241 Md. 137, 215 A.2d 825 (1966), that we clearly articulated the exception.[3] In *Waldman,* the plaintiff brought a medical malpractice action against the doctor who had operated on his fractured ankle. Three years passed, however, before the plaintiff discovered, by visiting another doctor, that the defendant had improperly treated the plaintiff's ankle. The defendant argued that the limitations period began to run when the

---

**3.** The roots of this exception can be traced to this Court's early cases in equity involving claims of fraud. In those cases, the discovery rule was applied to bar the running of the statute of limitations. *See, e.g., Franklin v. Waters,* 8 Gill 322 (1849); *McDowell v. Goldsmith,* 2 Md. Ch. 370, 391 (1847) ("In cases of fraud and mistake, the statute of limitations begins to run from time of the discovery of the fraud or mistake."). *Franklin, supra,* suggested in dicta that the question of the effect of fraud on the operation of the statute of limitations properly was relegated to the Chancery jurisdiction, and was an improper inquiry in a court of law. 8 Gill at 331. As a result of that case, this State passed the Act of 1868, thereby allowing parties to raise the fraud issue in courts of law as well as equity. *Wear v. Skinner,* 46 Md. 257, 266 (1877). *See generally, Geisz v. Greater Baltimore Medical,* 313 Md. 301, 324–25, 845 A.2d 658, 669 (1988).

wrong occurred, that is, on the date of the operation. The plaintiff, on the other hand, argued that his action did not accrue until "he knew or should have known that the pain and suffering in his ankle was due to *improper* surgical or medical treatment." *Id.* at 142, 215 A.2d at 829. (Emphasis added).

The *Waldman* Court declined the defendant's invitation to apply the date of the wrong rule and stated:

"The effect of ... [the date of the wrong rule] has frequently been to bar the plaintiff's claim not only before he sustained any perceptible harm, but before it was feasible for him to learn that the negligence had taken place.... Especially where the plaintiff is unqualified to ascertain the imperfection, as in the case of negligent performance of expert or professional services, it seems harsh to begin the period at the time of the defendant's act."

*Id.* at 140, 215 A.2d at 827 (quoting *Developments in the Law—Statutes of Limitations*, 63 Harv.L.Rev. 1177, 1201 (1950)).

Consequently, our predecessors in *Waldman* adopted the discovery rule as an exception to the date of the wrong rule in cases of medical malpractice. The Court noted that its newly adopted exception would not postpone accrual in many cases because a plaintiff would often know or have reason to know "soon after the wrongful act that he has been the victim of negligent medical care." *Id.* at 145, 215 A.2d at 830. In other cases, however, the Court recognized that it would be impossible for the average person, untrained in medicine, "to understand or appreciate that *actionable* harm has been done to him." *Id.* (Emphasis added). In those circumstances, the Court determined that the plaintiff should have the full statutory time to bring suit, and the action should accrue "the moment he knows or should know he has a *cause of action....*" *Id.* (Emphasis added).

In redefining the accrual point in medical malpractice cases, the *Waldman* Court realized that accrual at the time of the wrong did not provide an adequate opportunity for a diligent plaintiff to bring suit because he may be unaware during the statutory period that he has been injured. In repositioning the date of accrual, the Court was careful to preserve for diligent plaintiffs the full statutory period within which to bring suit. The Court therefore held that an action accrues when the victim knows or should have known the defendant rendered *negligent* medical care, not merely medical care. That is, limitations are triggered when the plaintiff knows or should have known that he has a cause of action.

After our adoption of the discovery rule in *Waldman,* we applied the same rationale to extend the discovery rule exception to other professional malpractice cases. *See, e.g., Mattingly v. Hopkins,* 254 Md. 88, 253 A.2d 904 (1969) (malpractice by engineer); *Mumford v. Staton, Whaley & Price,* 254 Md. 697, 255 A.2d 359 (1969) (malpractice by attorney); *Leonhart v. Atkinson,* 265 Md. 219, 289 A.2d 1 (1972) (malpractice by accountant). Our basic rationale in these cases, like *Waldman,* was that it was inherently unfair to deprive a diligent plaintiff the opportunity to bring the suit when he did not, and could not, know he had been injured due to the negligence of another.

The development of the discovery rule continued in *Harig v. Johns–Manville Prods. Corp.,* 284 Md. 70, 394 A.2d 299 (1978), where we faced a certified question asking whether under Maryland law the discovery rule applies to latent disease cases. The plaintiff in *Harig* brought a negligence and strict liability suit alleging that she developed asbestosis as a result of her exposure from 1940 through 1955 to the defendant's asbestos products. The plaintiff urged the Court to apply the discovery rule and argued that her action did not accrue until 1975 when she first discovered that she had asbestosis. The defendant argued that the plaintiff's action accrued no later than the date she was last exposed to its asbestos products in 1955.

The *Harig* Court traced the history of the discovery rule in Maryland and reviewed its prior application to professional malpractice cases. The Court recognized that the discovery rule " 'gives to the individual exercising reasonable diligence the full benefit of the statutory period in which to file suit, while at the same time protecting the defendant from "stale claims," as was intended by the statute.' " *Id.* at 79, 394 A.2d at 304 (quoting *Feldman v. Granger*, 255 Md. 288, 297, 257 A.2d 421, 426 (1969)). In adopting the discovery rule for latent disease cases the Court reasoned as follows:

> Like the victim of undiscoverable malpractice a person incurring disease years after exposure cannot have known of the existence of the tort until some injury manifests itself. In neither case can the tort victim be charged with slumbering on his rights, for there was no notice of the existence of a *cause of action.*

*Id.* 284 Md. at 80, 394 A.2d at 305. (Emphasis added). The *Harig* Court noted that latent disease and professional malpractice cases involve plaintiffs who may "be 'blamelessly ignorant' of the fact that a tort has occurred and thus, ought not be charged with slumbering on rights they were unable to ascertain." *Id.* at 83, 394 A.2d at 306. The Court concluded that avoiding possible injustice to potential plaintiffs outweighed any countervailing desire for defendant repose or administrative efficiency. Consequently, the Court held that an action arising from a latent disease accrues when a plaintiff knows or reasonably should know "the nature and cause of his injury." *Id.*

Like the *Waldman* Court, the *Harig* Court was careful to preserve a diligent plaintiff's right to bring suit. The *Harig* Court stated that a plaintiff must be aware "that a tort has occurred," and not merely that an injury has occurred. The *Harig* Court also made clear that an action accrues when the "nature and cause of the injury," and not merely when the nature of the injury, are known or should have been known.

The discovery rule finally evolved from the exception to the general rule in *Poffenberger v. Risser*, 290 Md. 631, 431 A.2d 677 (1981). In *Poffenberger*, the plaintiff purchased land in a planned development and contracted with the defendant to build a house on the property in compliance with all restrictions. The house was completed in 1972. In 1976, the parcel to the south of the plaintiff's property was surveyed, and the plaintiff discovered that his house did not meet the fifteen foot side lot setback requirement. Upon his discovery the plaintiff brought suit against the builder for negligence and breach of contract. The defendant responded with a general denial and filed a special plea that the action was barred by limitations.

The defendant argued that the action accrued when construction on the house began in 1972 or later that year when the plaintiff moved into the house. The plaintiff, on the other hand, argued that the discovery rule was applicable and the action did not accrue until his neighbor's lot was surveyed. We reviewed that history of the discovery rule in Maryland and noted its growth from medical malpractice cases to all professional malpractice cases and then also to latent disease cases. We saw no reason to limit the discovery rule's equitable effect to those cases and thus adopted it as the general rule.

We stated in *Poffenberger* that a "cause of action accrues when the claimant in fact knew or reasonably should have known of the wrong." *Id.* at 636, 431 A.2d at 680. The defendant conceded that the plaintiff did not have express knowledge of the wrong when the house was being built, but instead argued that the plaintiff should have known of the wrong at that time. In particular, the defendant argued that the plaintiff had constructive knowledge of the defendant's breach and negligence at the time the house was being built because the plats and deeds, showing the boundary lines, were on record. We rejected this argument holding that constructive notice is insufficient to give a plaintiff knowledge of the wrong. Instead, we ruled that actual knowledge, either express or implied, is necessary. We

defined implied actual knowledge as that knowledge that would in all probability have resulted from a reasonably diligent investigation pursued upon awareness of circumstances that would cause a reasonable person to investigate. We remanded the case to the trial court in order to resolve a factual dispute regarding whether, sometime prior to the survey of the adjacent lot, the plaintiff possessed knowledge from which actual notice could be inferred. In other words, it was debatable whether the plaintiff had knowledge of sufficient facts to cause a reasonable person to investigate further. In sum, *Poffenberger* extended the ameliorative effects of the discovery rule as described in *Waldman* and *Harig* to all cases and set the stage for future discussions regarding the function of implied knowledge in relation to the workings of the discovery rule.

Our development of the discovery rule did not stop with *Poffenberger*. Two years later we applied the discovery rule in *Pierce v. Johns–Manville Sales Corp.*, 296 Md. 656, 464 A.2d 1020 (1983). That case involved Charles Pierce, an insulation mechanic, who was exposed to asbestos products manufactured by the defendant. In 1973, a lung specialist informed Pierce that his exposure to asbestos had caused him to contract asbestosis. Pierce was also then informed that he might develop lung cancer, but it was not until November, 1979, that Pierce was diagnosed as having lung cancer. Pierce died two months later. In March, 1980, Pierce's widow brought a survival action and wrongful death suit against the defendant based on negligence and strict liability. The defendant claimed that the plaintiff's action was barred by limitations.

The defendant argued that Pierce's action accrued when he developed asbestosis. At that point, argued the defendant, Pierce knew or should have known of later injury he would suffer from lung cancer. The plaintiff argued that although asbestosis and lung cancer are both associated with exposure to asbestos, there is no medically accepted link between developing asbestosis and lung cancer, and thus he had no way of knowing he would develop lung

cancer at that time. Pierce maintained that his action accrued when he was diagnosed as having lung cancer in late 1979.

We began our analysis in *Pierce* by reiterating our test for determining when an action accrues—when the plaintiff knew or reasonably should have known of the nature and cause of the harm. *Id.* at 663, 464 A.2d at 1025. We then set forth the purposes of limitations statutes:

> The adoption of statutes of limitation reflects a policy decision regarding what constitutes an adequate period of time for a person of reasonable diligence to pursue a claim. Such statutes are designed to balance the competing interests of each of the potential parties as well as the societal interests involved. Thus, one of the purposes of such statutes is to assure fairness to a potential defendant by providing a certain degree of repose. This is accomplished by encouraging promptness in prosecuting actions; suppressing stale or fraudulent claims; avoiding inconvenience that may stem from delay, such as loss of evidence, fading of memories, and disappearance of witnesses; and providing the ability to plan for the future without the uncertainty inherent in potential liability. Another basic purpose is to prevent unfairness to potential plaintiffs exercising reasonable diligence in pursuing a claim. Still another purpose is to promote judicial economy.

*Id.* at 665, 464 A.2d at 1026.

In analyzing the competing interests, we recognized that defendant repose would be somewhat fostered by holding that the action accrued when the asbestosis surfaced. We also reasoned, however, that it would be unjust to require Pierce to seek damages for lung cancer at the time he discovered asbestosis because lung cancer is a separate and distinct disease from asbestosis. Maryland law does not allow for damages based on mere possibility, and at the time Pierce discovered he had asbestosis there was no medical evidence that would show there was a probability that he would develop lung cancer. Thus, it would have

been fruitless for him to sue at that time to recover damages for possible future lung cancer. We determined that if Pierce's action accrued at the time he discovered he had asbestosis, his "right to recover for the latent disease of lung cancer would, as a practical matter, be nullified." *Id.* at 667, 464 A.2d at 1027. Finally, we found that judicial efficiency would be promoted if accrual did not occur until lung cancer manifested itself. Otherwise, plaintiffs would be forced to file anticipatory suits after every injury to ensure that they would not be foreclosed from suits for injuries that had not yet developed. In weighing the three factors we concluded that the action accrued when Pierce knew or should have known of his lung cancer.

We found that this result "affords a reasonably diligent person, who is unable to discover the existence of a latent disease, *the full benefit of the statutory period in which to file suit,* retains some degree of protection of a potential defendant's right to repose, and promotes judicial efficiency." *Id.* at 668, 464 A.2d at 1027–28. (Emphasis added).

*Pierce* was a strong amplification of our prior discovery rule cases. It applied our time-tested policy concerns and carefully weighed each factor. The test we laid out there requires the plaintiff to know or have reason to know (1) that he has suffered injury and (2) that the injury was caused by the defendant. *Pierce* thus sums up the rationale of our prior cases and stands in line with *Waldman, Harig,* and *Poffenberger* in preserving for plaintiffs the full statutory period within which to bring suit.

We reaffirmed our *Pierce* decision two years later in *Smith v. Bethlehem Steel Corp.,* 303 Md. 213, 492 A.2d 1286 (1985), a case with substantially similar facts. Smith, like Pierce, worked near asbestos, later suffered from asbestosis, subsequently developed cancer, and then brought suit within three years of being diagnosed as having cancer. Smith was different from Pierce in two ways: (1) unlike Pierce, Smith brought suit himself to recover for damages from asbestosis; and (2) Smith suffered from colon cancer, not lung cancer. The defendants argued that these distinc-

tions were sufficient to require a result different from *Pierce.*

In reaching our decision in *Smith* we reviewed *Pierce,* and again weighed the conflicting policy considerations underlying the statute of limitations. We found that because the damages for cancer were sought during the pendency of the asbestos suit, the defendants' interest in repose was not as strong. We recognized that the interest of a diligent plaintiff to bring suit, however, would be just as strong. In both *Smith* and *Pierce* the plaintiffs would be put in a Catch–22 position if their actions accrued at the time asbestosis developed—if the plaintiffs brought suit then, they could not put on proof of the degree of likelihood that cancer would ensue, and if they were to wait until cancer developed, they would be barred by limitations. We also found that the third factor to be weighed, society's interest in judicial economy, was just as strong in *Smith* as it was in *Pierce.* Consequently, we held that as long as Smith could prove that colon cancer, like lung cancer, was a latent disease separate and distinct from asbestosis, his action for damages from cancer did not accrue until his cancer was discovered.

Subsequent to *Smith,* we decided *O'Hara v. Kovens,* 305 Md. 280, 503 A.2d 1313 (1986), where we granted certiorari "primarily to consider the respective functions of court and jury in determining whether the plaintiffs knew or should have known of the wrong more than three years before suit." *Id.* at 282, 503 A.2d at 1314. The suit involved the sale of the plaintiffs' stock in a corporation that owned the Marlboro racetrack. The value of the racetrack, and consequently the corporate stock, depended to a large extent on how many days of racing the legislature would permit at the track. In 1971, the General Assembly passed an act that would have allowed extra days for Marlboro racetrack, but Governor Mandel vetoed the bill in May, 1971. On the last day of 1971, the plaintiffs sold their stock to an agent allegedly working for the defendants. The legislature then overrode the Governor's veto in January, 1972. The plain-

tiffs contended that the defendants defrauded them by conspiring to, first, have Mandel veto the bill, thus causing the value of the stock to be depressed, second, buy the stock at the depressed price, and third, have Mandel induce the legislature to override his veto. Conflicting evidence as to when the plaintiffs should have discovered this fraudulent scheme was presented at a jury trial. The trial judge, however, acted as factfinder on the issue of when the plaintiffs' action accrued and granted summary judgment in favor of the defendants.

As a preliminary matter in *O'Hara*, we discussed the proper timing of the accrual of a cause of action in light of the defendants' argument that the plaintiffs "reasonably should have known of the wrong" more than three years before filing suit. Stated another way, when does the statute of limitations begin to run when the plaintiff's knowledge of the wrong is implied from the circumstances. In regard to this question we first looked to the language from *Poffenberger* where we stated that a plaintiff reasonably should have known of the wrong if the plaintiff has

knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry [thus, charging the individual] with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued.

*Poffenberger*, 290 Md. at 637, 431 A.2d at 681. From this language the question was raised "whether the period required for any investigation which should have been prompted by notice and *which would have led to the discovery of the fraud* precedes the date of accrual and is to be excluded from the three-year period of limitations." *O'Hara*, 305 Md. at 288, 503 A.2d at 1317. (Emphasis added). Citing with approval *Lutheran Hospital v. Levy*, 60 Md.App. 227, 482 A.2d 23 (1984), we concluded that under the discovery rule, as stated in *Poffenberger*, limitations begin to run when a plaintiff gains knowledge sufficient to prompt a reasonable person to inquire further. In other words, the beginning of limitations is not postponed

until the end of an additional period deemed reasonable for making the follow-up investigation. *O'Hara,* 305 Md. at 288–89, 503 A.2d at 1317–18.

Since the proper scope and function of the inquiry notice rule is of vital importance to an understanding of the operation of the discovery rule in the case *sub judice,* we will take this opportunity to elaborate on the specific circumstances under which the inquiry notice rule will start the running of the statute of limitations. To illustrate our point we will examine the facts of the *Levy* case.

In October, 1973, Ms. Levy broke her ankle and had it put in a cast at Lutheran Hospital. Shortly thereafter, a physician at the hospital told her to throw away her crutches and walk on the ankle. Ms. Levy, however, had continuing trouble with the ankle and consulted a physician at Mercy Hospital in April, 1974, who advised Ms. Levy that her ankle "was all messed up" and asked her "who the hell told her to walk on that ankle?" She was also advised that the condition of her ankle would not improve. Notwithstanding this information, Ms. Levy did not consult an attorney until early 1975. Furthermore, it was not until July, 1977, that Ms. Levy's treating physician examined the x-rays taken of Ms. Levy's ankle at Lutheran in 1973 and concluded that Ms. Levy was the victim of medical malpractice. Ms. Levy did not file suit until June, 1978.

From these facts it is clear that: (1) a reasonably prudent person, with knowledge of all the facts and circumstances available to Ms. Levy following her consultation with the physician at Mercy Hospital, would have undertaken further investigation to learn if legal action against the physician from Lutheran was justified; and (2) had Ms. Levy immediately engaged in a reasonably diligent investigation, she would have discovered that she was the victim of negligent medical care. Therefore, in simple terms, a plaintiff is only on inquiry notice, and thus the statute of limitations will begin to run, when the plaintiff has "knowledge of circumstances which would cause a reasonable person in the position of the plaintiff[ ] to undertake an

investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged [tort]." *O'Hara*, 305 Md. at 302, 503 A.2d at 1324. In such a situation, should the plaintiff fail to seek out the facts supporting a cause of action, it can fairly be said that the plaintiff has inexcusably slept on his rights. *Accord Franzen v. Deere and Co.*, 377 N.W.2d 660 (Iowa 1985) (plaintiff who was injured when apron on floor of forage wagon suddenly moved, knew of injury and cause at the time it occurred, and could have discovered alleged defects at that time if investigation had been pursued). *But cf. Knaps v. B & B Chemical Co., Inc.*, 828 F.2d 1138 (5th Cir.1987) (although plaintiff suspected that defendant's soap caused skin disorder, diligent investigation did not reveal causal connection until several years later); *Stoleson v. United States*, 629 F.2d 1265 (7th Cir.1980) (although plaintiff suspected that exposure to nitroglycerin had precipitated her heart condition, the statute of limitations did not begin to run until medical science became aware of the causal relationship).

Applying the inquiry notice rule to the facts presented in *O'Hara*, and in light of the defendants' motion for summary judgment in that case, the defendants had the burden of proving that more than three years before filing suit (1) the plaintiffs knew of facts sufficient to cause a reasonable person to investigate further, and (2) a diligent investigation would have revealed that the plaintiffs were victims of fraud, the alleged tort. The defendants offered various newspaper articles published more than three years before the suit was filed in an attempt to prove this latter proposition. The plaintiffs conceded that the statute of limitations would start to run as of the date of inquiry notice. However, the plaintiffs asserted that they were first on inquiry notice within three years of filing suit.

In addressing whether summary judgment in favor of the defendants on the limitations issue was proper, we initially clarified a point of confusion in the lower courts. Specifically, we indicated that the court has the exclusive power to

determine the manner of operation of the discovery rule in different types of cases, *O'Hara*, 305 Md. at 298, 503 A.2d at 1322, while on the other hand, "questions of fact on which a limitations defense will turn are to be decided by the jury or, when sitting as a jury, by the court." *Id.* at 301, 503 A.2d at 1323. Since the question of whether the plaintiffs were on inquiry notice of their cause of action more than three years before filing suit was a question of fact determinative of the limitations defense, the trial court erred in granting summary judgment unless reasonable men could not find otherwise. In reversing the trial court's grant of summary judgment, we found that it was at least debatable whether the plaintiffs were aware of facts sufficient to warrant investigation. *Id.* at 303–04, 503 A.2d at 1324–25. Thus, under the first prong of the inquiry notice rule, whether the plaintiffs were charged with the duty to investigate was for the jury to decide.

Subsequent to *O'Hara*, operation of the inquiry notice rule was brought into question in *Baysinger v. Schmid Products Co.*, 307 Md. 361, 514 A.2d 1 (1986), a products liability case. In *Baysinger*, the plaintiff had a Saf–T–Coil intrauterine contraceptive device inserted at a family planning clinic in May, 1979. In November of that year the device was removed by a physician when the plaintiff began to experience lower abdominal pains. Approximately one month later, the plaintiff was admitted to a hospital and diagnosed as having acute peritonitis with bilateral tubo-ovarian abscesses.

At the time of the plaintiff's hospitalization, she questioned her treating physician and his associate as to whether the device had caused her illness. The plaintiff was advised that there could be several possible causes and, although intrauterine devices had been associated with pelvic infections in medical literature, there was no way of determining whether her infection was caused by the Saf–T–Coil. Four years later, in January, 1983, the plaintiff received notice of possible causation through an advertise-

ment in a local newspaper. At that time, the plaintiff retained counsel and filed suit.

The defendant, Schmid Products, filed a motion for summary judgment arguing that the statute of limitations had expired. The trial court granted the motion and was affirmed by the Court of Special Appeals in an unreported opinion. On appeal to this Court, we found that the trial judge erred in concluding as a matter of law that the plaintiff had notice of her cause of action in late 1979. Our reversal was based on the finding that a question of fact existed as to the point in time in which Mrs. Baysinger had knowledge of circumstances which would cause a reasonable person in her position to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the wrong. We reasoned as follows:

> While the sparse record of facts before the trial judge demonstrated that Mrs. Baysinger's suspicions concerning the cause of her infection included the intrauterine device, it also showed that she initiated a preliminary investigation by discussing her suspicions with Dr. Cho, and that Dr. Cho told her he had "no way of determining whether her infection was caused by the Saf–T–Coil or by some other unrelated occurrence or instrumentality." The record further discloses that at that time Dr. Gallaher had no idea of what caused her illness, and consequently further investigation by way of inquiry of Dr. Gallaher would have been fruitless. We further note that while the record indicates that Mrs. Baysinger entertained various suspicions concerning the cause of her illness, there is no evidence that she then suspected, or reasonably should have suspected, wrongdoing on the part of anyone. *Whether a reasonably prudent person should then have undertaken a further investigation is a matter about which reasonable minds could differ, and it was therefore inappropriate for resolution by summary judgment.*

*Id.* at 367–68, 514 A.2d at 4. (Emphasis added). By implication, *Baysinger* teaches that if the first prong of the

inquiry notice rule is answered in the negative, i.e., a reasonable person would not investigate or continue to investigate, then the second prong of the inquiry, i.e., whether a reasonably diligent investigation would have led to the discovery of the wrong, is not even considered.

## II

■ Our review of the preceding cases reveals that the discovery rule has evolved as a means of mitigating the often harsh and unjust results which flow from a rigid application of the statute of limitations. It is likewise clear that this Court is empowered to define the operation of the discovery rule to further its purposes under varying factual circumstances. *Poffenberger, supra; Trimper v. Porter–Hayden,* 305 Md. 31, 501 A.2d 446 (1985); *Geisz v. Greater Baltimore Medical,* 313 Md. 301, 545 A.2d 658 (1988). With this in mind, it is the considered judgment of this Court that application of the discovery rule in a product liability action requires that the statute of limitations should not begin to run until the plaintiff knows or through the exercise of due diligence should know of injury, its probable cause, and either manufacturer wrongdoing or product defect. This approach is consistent with that of other jurisdictions. *See Goodman v. Mead Johnson & Co.,* 534 F.2d 566 (3d Cir. 1976); *Rockstroh v. A.H. Robins Co., Inc.,* 602 F.Supp. 1259 (D.Md.1985); *Dawson v. Eli Lilly & Co.,* 543 F.Supp. 1330 (D.D.C.1982); *Bonney v. Upjohn Co.,* 487 F.Supp. 486 (W.D.Mich.1980); *Sparks v. Metalcraft, Inc.,* 408 N.W.2d 347 (Iowa 1987); *Anthony v. Abbott Laboratories,* 490 A.2d 43 (R.I.1985).

Moreover, this approach is consistent with our prior cases as well as practical considerations. In *Waldman,* 241 Md. at 140, 215 A.2d at 827, we intimated that it would be unduly harsh to start the statute of limitations running before it was feasible for the plaintiff to learn that *negligence* had taken place. Likewise, in *Harig,* 284 Md. at 80, 394 A.2d at 305, we indicated that a tort victim cannot be accused of slumbering on his rights until there is notice of a

*cause of action.* Finally, in discussing the inquiry notice rule in *O'Hara,* we made clear that an investigation prompted by notice must lead to discovery of the *alleged tort.* *O'Hara,* 305 Md. at 288, 503 A.2d at 1317.

In terms of the policy considerations underlying the statute of limitations, we have historically been concerned with three factors. Those factors, again, are: (1) the interest of diligent plaintiffs to bring suit; (2) the interest of defendants to enjoy repose after an unreasonable delay by plaintiffs; and (3) the interest of society in promoting judicial economy.

In analyzing the first consideration, we find that a products liability plaintiff, asserting negligence and strict liability, would be inequitably penalized if the limitations period began to run before he should reasonably discover manufacturer wrongdoing or a product defect. To bring a negligence action, a plaintiff must prove: (1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty by the defendant; (3) an injury to the plaintiff; and (4) that the injury was proximately caused by the defendant's breach of duty. *Read Drug Co. v. Colwill Constr.,* 250 Md. 406, 412, 243 A.2d 548, 553 (1968). We have previously held that limitations do not begin until a plaintiff knows or reasonably should know the nature and cause of his harm. *See Harig, supra; Pierce, supra.* The nature and cause of a harm would be elements (3) and (4) of a negligence action. In our prior cases, discovery of elements (1) and (2) were not in question. We see no reason, however, to hold that a plaintiff who cannot discover injury or causation should be entitled to relief while a plaintiff who cannot discover breach of duty is left without a remedy. A plaintiff who cannot gain knowledge of a defendant's breach of duty is in the same position as one who cannot discover injury because both are "blamelessly ignorant" and cannot be said to have slept on their rights.

Similarly, for a plaintiff to bring a strict liability claim for product liability he must show, *inter alia,* (1) that the plaintiff was injured; (2) that the product was defective;

and (3) that the product defect caused the injury. *Phipps v. General Motors Corp.*, 278 Md. 337, 353, 363 A.2d 955, 963 (1976). Again, our prior case law would not start the limitations period until the plaintiff knew or should have known of the wrong. And, in the case of strict liability, the "wrong" includes a product defect. Thus, the limitations period should not begin until a product defect is discovered or should have been discovered by the plaintiff. That result ensures plaintiffs the full statutory period to bring suit.

We find that a plaintiff who cannot discover manufacturer wrongdoing or product defect through a reasonably diligent investigation is in the same predicament as the plaintiffs in *Pierce* and *Smith*. Just as Pierce and Smith could not have recovered for damages related to cancer before cancer developed, a plaintiff who cannot establish a breach of duty by the defendant or a product defect cannot recover for harm done in a medical products liability case. Thus, the plaintiff is put in a Catch–22 position—if he files suit within three years of discovery of the nature and cause of his injury he will have no proof of breach of duty or product defect and will be denied a remedy, and if he waits until he gains the necessary knowledge of the defendant's breach of duty or product defect, the statute of limitations will bar his suit. We therefore find that the first factor weighs heavily in favor of the position that a medical products liability action does not accrue until the plaintiff knows or should know of the manufacturer wrongdoing or product defect.

The second factor we must consider is a defendant's interest in repose. Here we are concerned with the inconvenience and unfairness to defendants that stem from delay in bringing suit, and the need for defendants to be free of ancient liabilities so as to be able to plan for the future without the uncertainty inherent in potential liability. We find the defendant's interest in repose is not significantly hindered by holding that a medical products liability action does not accrue until the plaintiff knows or should know of manufacturer wrongdoing or product defect.

The inconvenience and unfairness to defendants that occur because of delay in bringing suit is primarily due to the loss of evidence, fading of memories, and disappearance of witnesses. In a medical products liability case, much of the evidence will be documentary, such as hospital records and charts and manufacturer testing reports and procedure manuals. This type of evidence is normally readily available and there is little chance of it becoming lost. Concomitantly, the fading of witnesses' memories and disappearance of witnesses becomes less important. And, to a certain extent, witnesses' memories may be refreshed in many cases by reviewing the relevant documentary evidence. Thus, the delay caused by allowing a suit to be brought three years after a medical products liability plaintiff knows or should know of manufacturer wrongdoing or product defect results in little inconvenience or unfairness to defendants. *Accord Bonney v. Upjohn Co.*, 487 F.Supp. 486, 495 (W.D.Mich.1980); *Anthony v. Abbott Laboratories*, 490 A.2d 43, 47 (R.I.1985).

Allowing an action to accrue at the time a plaintiff knows or should know all the elements of his cause of action, however, does keep a defendant shackled to long past liabilities and hinders a defendant's ability to plan for the future. When a medical products liability defendant confronts potential liability years after it has made and sold a product, it faces a contingent liability that is difficult to quantify and which may materialize at almost any time. Consequently, financial planning is burdened. Thus, defendants in medical products liability actions have a legitimate interest in starting the limitations clock as soon as possible.

■ To resolve this conflict, we examine society's interest. We find that judicial economy would be promoted by starting the limitations period at the time a plaintiff knows or should know he has a cause of action. Thus, generally, a cause of action for a plaintiff in a medical products liability action would accrue when he knew or should have known (1) he suffered injury; (2) the injury was caused by the

defendant; and (3) there was manufacturer wrongdoing or a product defect. To hold otherwise we would encourage, indeed almost force, a person who is injured by a drug to immediately file suit against the manufacturer without knowledge of manufacturer wrongdoing or a product defect, in order to prevent the statute of limitations from running. Injured persons would become plaintiffs against every possible party without knowledge of wrongdoing or product defect in hope that such evidence would eventually emerge. As a result, the courts would be crowded with potentially frivolous claims. This result is not consistent with the unarguably sound position that unfounded claims should be discouraged. We believe it would be more efficient to allow the plaintiff the statutory period to bring suit from the time he discovers or should have discovered he has a cause of action. This rule would not encourage plaintiffs to bring suit too early and would prevent plaintiffs from bringing suit too late because they would be required to be diligent in their investigations. Thus, our judicial time would be most efficiently spent.

A weighing of these three interests in a products liability case dictates that fairness to diligent plaintiffs and the promotion of judicial efficiency outweigh defendants' interest in repose, and therefore, an action accrues when the plaintiff knew or should have known he had a cause of action. *See Harig, supra.* In the case of products liability, this requires express or implied knowledge of manufacturer wrongdoing or product defect.

█ We return then to the certified question:
Whether under the discovery rule, knowledge of the manufacturer's wrongdoing or of product defect is required, in addition to knowledge of possible causation, to trigger the statute of limitations in a medical products liability action.

If the District Court used the word knowledge to mean clear and unequivocal proof that a certain manufacturer's negligence produced a defective product causing the plain-

tiff's injury, then we would answer the question no. If use of the term knowledge means express or implied knowledge of injury, its probable cause, and probable manufacturer wrongdoing or product defect, then we would answer the question yes.

CERTIFIED QUESTION ANSWERED AS HEREIN SET FORTH; COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.